**VAN–GO TRANSPORT CO., INC.,** Sterling Coach Corp., Celebrity Transit Corp., Paul Dachs and C. Isaac Dachs, Plaintiffs,

v.

**NEW YORK CITY BOARD OF EDUCATION,** New York City, Kevin F. Gill, and Richard W. Scarpa, Defendants.

Civil Action No. CV–95–2660(DGT).

United States District Court,
E.D. New York.

July 30, 1997.

Elliot J. Mandel, Kaufman, Naness, Schneider & Rosensweig, P.C., Jericho, NY, Robert J. Jossen, Shereff, Friedman, Hoffman & Goodman, LLP, New York City, for Plaintiffs.

Paul Crotty, Corporation Counsel of City of New York by Susan M. Shapiro, New York City, for Defendants.

## OPINION

TRAGER, District Judge.

Among other issues, this case raises an interesting and somewhat novel defamation question. In an age of increasingly efficient information collection, the case highlights the conflict between the justifiable goal of more efficient government and a person's interest in his reputation, that "plant of tender growth, [whose] bloom, once lost, is not easily restored." *Karlin v. Culkin,* 248 N.Y. 465, 478, 162 N.E. 487 (N.Y.1928) (Cardozo, C.J.). Specifically, the case presents the question whether, under New York State law, the traditional rule that consent to publication bars a defamation claim should be applied where to bid on government contracts a person must place defamatory material into New York City's computerized procurement system. I conclude that the New York Court of Appeals would hold that an action for defamation should lie where a plaintiff has no

realistic alternative but to submit the defamatory material.

Plaintiffs are three corporations (Van–Go, Sterling Coach, and Celebrity Transit), all in the business of providing bus or van transportation, and Paul and Isaac Dachs, their two principals. Van–Go had a two year contract with the Board of Education ("BOE" or "Board") from September 1988 that had repeatedly been extended through June 30, 1996, providing transportation for severely disabled pupils in vans with a driver and two escorts. This contract required Van–Go's drivers to carry the pupils from their residences. *See* Compl. ¶¶ 14–15.

The events leading to this lawsuit apparently resulted from a labor dispute. In 1993, Van–Go was not organized by Local 1181–1061, Amalgamated Transit Union, AFL–CIO ("Local 1181"), the primary union representing bus drivers for the BOE; instead, it paid lower wages and was organized by District 6 International Union of Industrial, Service, Transport and Health Employees ("District 6"), whose contract expired on March 31, 1994. *See* Compl. ¶ 25. In October or November 1993 paid organizers from Local 1181 began organizing Van–Go employees. *See* Compl. ¶ 26. At the same time, District 6 filed a still-unresolved unfair labor practices complaint against Van–Go, blocking any change in union representation. *See* Compl. ¶ 27.

In late January or early February 1994, the BOE's Executive Director of Operational Support Services Kevin Gill placed Van–Go's contract out for re-bid "in anticipation of the successful organization of Van–Go by Local 1181 and what seems to be an inevitable job action as a result." Defs.' Ex. D, undated Ltr. from Kevin Gill ("Gill Ltr."). The letter states: "The President of Van–Go has informed us that he will not be able to pay the wages typically demanded by Local 1181 under the current terms of his Board contract." *Id.*

The contract between Van–Go and the BOE also required that Van–Go's employees be approved pursuant to a background check, mental fitness report, drug test, and training course. Plaintiffs assert that this process often took six months to a year. *See* Compl.

¶ 17. The contract between Van–Go and the BOE included a clause stating: "The Contractor must have sufficient, qualified and approved personnel to enable the Contractor to dispatch substitute escorts promptly if, when and where necessary to ensure continuous, uninterrupted and punctual service in each and every instance." Defs.' Ex. A "Extension and Second Amendment of Contract," § (D) at 10. Plaintiffs allege that it was the BOE's "uniform practice and policy to approve conditionally new employees...." Compl. ¶ 18. Plaintiffs state that the BOE has no policy limiting the number of conditional employee approvals, *see* Compl. ¶ 21, and had previously "certified conditionally drivers in excess of the number needed for regular service...." Compl. ¶ 23.

Van-Go learned that Local 1181 planned to initiate a strike against it around April 4, 1994; it notified the BOE by letter dated March 16, 1994. *See* Compl. ¶¶ 29–30. The BOE certified potential replacement workers as it had in the past. *See* Compl. ¶¶ 32–33. Plaintiffs allege that Local 1181 called off the strike because the BOE had conditionally certified replacement workers. *See* Compl. ¶ 35.

The complaint further alleges that Gill discussed Van–Go's attempts to obtain replacement workers with representatives of Local 1181. *See* Compl. ¶ 37. Gill, on behalf of the BOE, informed Van–Go by letter dated April 7, 1994, that it would not conditionally approve employees " 'to act as strike breakers....' " Compl. ¶ 38. Plaintiffs contend that Gill's act was a deviation from its longstanding practice of conditional certification, and that as a result, Van–Go was unable to obtain replacement employees. *See* Compl. ¶¶ 38–42. Gill's action was appealable to the Chancellor, who acts through a Board of Review, which has the power to review Gill's decision as well as contractor qualifications. *See* Defs.'s Mot., Aff. of Richard Langford, Deputy Dir. of Contractual and Regulatory Affairs dated Sept. 15, 1995 ¶¶ 9–13, 21–23. Van–Go did appeal to the Board of Review, but no hearing was ever held. *See* Compl. ¶ 45.

Plaintiffs allege that Local 1181 initiated a strike against Van–Go on June 27, 1994, pursuant to an "arrangement" with the BOE whereby the BOE would refuse to certify conditional replacements and the union would not strike until a time that "would not interfere unduly with the school calendar." Compl. ¶¶ 47–48. As a result of the strike, Van–Go was unable to perform under the contract and was defaulted by the Board of Review on June 30, 1994. *See* Defs.' Ex. C., Ltr. to Gill from Arthur H. Avedon, Administrator dated July 1, 1994.

Subsequently, Celebrity and Sterling, the sister companies of Van–Go, submitted proposals for the Van–Go contract. Sterling was the apparent low bidder for contract number 7200, and Celebrity was the apparent low bidder for contract number 7291. *See* Defs.' Ex. E, Ltr. from Gill to Paul Dachs dated July 27, 1994. In both cases, the BOE, acting through Gill, requested "written assurance and a plan" that would describe how the companies would fulfill their contracts given Van–Go's labor problems. Compl. ¶¶ 55–58, Defs's Ex. E. At the time the bids were submitted, Sterling had no employees. *See* Defs.' Ex. H, Test. of Paul Dachs at Board of Review Hr'g November 9, 1994, at 5. Plaintiffs assert that this request was an additional requirement not in the bid materials, not ordinary practice, and that other contractors were not subjected to this requirement. *See* Compl. ¶ 57. By letter dated August 4, 1994, Celebrity and Sterling provided a plan to Gill proposing that replacement workers be used in the event of a strike. *See* Compl. ¶ 59.

On August 23, 1994, the BOE informed Celebrity and Sterling that it was awarding the contracts to other contractors because their refusal to perform without conditional certification of workers constituted a "qualification [conditional submission] of the bid." Compl. ¶ 60; Defs.' Ex. F, Ltr. from Richard W. Scarpa, Acting Director of Purchasing to Paul Dachs dated August 23, 1994 ("Scarpa Ltr."). This letter also stated that the BOE had received allegations of criminal activity,

specifically, "the possibility of criminal activity constituting the offer of gratuities to government officials," which provided another ground for refusal to award the bid. Scarpa Ltr. Plaintiffs allege that this statement was false, and made with knowledge of its falsity, or with reckless disregard for its accuracy. *See* Compl. ¶ 62.

Plaintiffs appealed to the Board of Review on August 29, 1994. *See* Compl. ¶ 64. On October 14, 1994, plaintiffs requested that the BOE produce the names of the persons who were the sources of the allegations concerning gratuities. The BOE refused to provide these names, but also stated that no testimony concerning gratuities would be permitted at the hearing. *See* Compl. ¶¶ 64–66; Defs.' Ex. G. No testimony regarding the allegations was presented at the hearing; plaintiffs allege this lack of testimony was due to defendants' knowledge that the accusations were false. The Board of Review, finding that Sterling and Celebrity submitted "qualified" bids, denied the appeal on November 23, 1994, and issued a formal decision on April 26, 1995. *See* Compl. ¶¶ 67–69; Defs.' Ex. H.

Plaintiffs further allege that the BOE's acts were taken on behalf of Local 1181; that the false allegations regarding gratuities have been entered into the City's procurement system, resulting in their reappearance for every City bid; that the Department of Transportation delayed in awarding a contract to Celebrity because of the allegations; and that the plaintiffs have had no opportunity to refute the allegations of gratuities. *See* Compl. ¶¶ 70–73.

Plaintiffs brought suit in this court on June 30, 1995. Their complaint alleged five causes of action. Two counts were brought under 42 U.S.C. § 1983, alleging violations of federal labor law and due process.[1] Plaintiffs also pled several state law claims: breach of contract, breach of duty of good faith and fair dealing, and defamation. Plaintiffs seek damages, a declaratory judgment and a permanent injunction.

---

**1.** In *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110–14, 110 S.Ct. 444, 451–52, 107 L.Ed.2d 420 (1989), the Supreme Court held that NLRA violations are actionable under § 1983.

In 1995, the defendants moved to dismiss portions of the plaintiffs' complaint for failure to state a claim. At a motion hearing on April 16, 1996, the City's motion to dismiss was denied, and plaintiffs' claims for contract and lost profits damages were limited to Van–Go Transport only, as a matter of law. Decision was reserved on the motion for dismissal of the defamation claims, and the defendants were directed to produce copies of the City's computer vendor tracking system ("Vendex") reports on plaintiffs. *See* 4/16/96 Tr. at 52.

Because both parties submitted materials beyond the complaint the remaining part of the motion was converted into one for summary judgment. Upon notice to the parties of the conversion, and additional oral argument, this remaining portion of the motion was granted in part and denied in part on February 6, 1997. This opinion explains the reasons for that decision.

Count V of the complaint alleges that two defamatory statements were made. The complaint first alleges that

Richard W. Scarpa, on his own behalf and on behalf of Mr. Gill, the Board and the City, published one or more false statements disparaging the quality of the services provided by [plaintiffs] and impugning the integrity of [plaintiffs]. These statements include, but are not limited to, a letter dated August 23, 1994, making false allegations of "possibl[e] . . . criminal activity constituting the offer of gratuities to government officials." Upon information and belief, these statements were published to Board employees and others, and were entered into the City's computerized procurement system.

Compl. ¶ 107. This allegation is based on the Scarpa letter, which states in pertinent part:

Your letter clearly indicates neither Sterling Coach nor Celebrity is prepared to perform in the event of award unless the Office of Pupil Transportation changes its policy with regard to conditional certification of school bus drivers. As this requirement constitutes a qualification of the bid, we are rejecting both submissions in accordance with paragraph 7 of each bid

document entitled, "RESPONSIVE BIDS."

While this constitutes sufficient cause for rejection alone, we are also in receipt of allegations from former employees of Van–Go Transport which call into question the prior performance and integrity of the principals of Sterling Coach and Celebrity and indicate the possibility of criminal activity constituting the offer of gratuities to government officials. Therefore a second cause for rejection of the submissions of those two companies is based on those allegations and in accordance with paragraph 14 of each bid entitled, "ABILITY TO PERFORM."

The second defamatory statement ("second claim") is alleged to be contained in the Gill letter, which the complaint refers to as follows:

The Board, the City and Mr. Gill further defamed plaintiffs in an undated letter signed by Mr. Gill, sent in or about late January or early February 1994 to many or all of Van–Go's competing contractors. In that letter, Mr. Gill stated that it was "inevitable" that Division 1181 would strike Van–Go, and that the job action would result in "disruption of service." For this reason, the letter said, the Board was putting all of Van–Go's Contract work out for re-bid to other contractors.

Compl. ¶ 109. The letter stated:

The school bus company currently providing this service is in the second year of a three year extension and provides excellent service to the children. Normally, we would have no reason to bid this work. However, there is a strong possibility that the company currently providing the service, Van–Go Transportation, will be organized by Local 1181 of the Amalgamated Transit Union. The wages paid under Local 1181 collective bargaining agreements with the other school bus companies under contract to the Board of Education are higher than those currently being paid by Van–Go and there is every reason to believe that, in the event the organization is successful, the same will be required of Van–Go. The President of Van–Go has informed us that he will not be able to pay

the wages typically demanded by Local 1181 under the current terms of his Board contract. Therefore, we are requesting bids for this work in anticipation of the successful organization of Van–Go by Local 1181 and what seems to be an inevitable job action as a result.

... It is our intention to be prepared for any disruption in service by having a plan in place to resume service as quickly as possible....

... The start date of the contract has been left open purposely because we do not know when or if the anticipated action will occur.

... Bidders should also be aware that in the event there is no job action, we do not intend to make an award.

The complaint alleges that "these statements falsely impugned the basic trustworthiness and integrity of plaintiff's business, and are libel *per se*." Compl. ¶ 110. The complaint also alleges that the statements were made with actual malice, and that they "were wilful, intentional and wanton." Compl. ¶ 111.

In support of their motion, defendants make several arguments. Defendants argue that the Gill letter is not defamatory, that the statements are true or substantially true, and that the communication is privileged. Defendants argue that the Scarpa letter is not defamatory when considered in context, that there was no publication of the letter's contents, that the communication is qualifiedly privileged, and that plaintiffs failed to plead special damages.

## Motion Conversion and Summary Judgment Standard

Although defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), they submitted additional evidence in the form of letters, exhibits, affidavits, and a declaration. Plaintiffs submitted a declaration that incorporates by reference the statements in the complaint. The motion was converted, upon notice and an opportunity to be heard, into one for summary judgment. *See* Fed. R.Civ.P. 12(c); *Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 592 (2d

Cir.1993); *In re G & A Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985).

On a motion for summary judgment, the moving party bears the burden of showing the absence of a genuine issue of material fact. *See B.F. Goodrich v. Betkoski,* 99 F.3d 505, 521 (2d Cir.1996) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). "[A]ll inferences from the underlying facts must be drawn in the non-movant's favor." *B.F. Goodrich,* 99 F.3d at 521 (citing *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995)). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying the materials submitted that demonstrate the absence of a genuine issue of material fact. *See Cubby, Inc. v. CompuServe, Inc.,* 776 F.Supp. 135, 138 (S.D.N.Y.1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). In cases such as this, "where the moving party does not bear the ultimate burden of proof on an issue ... that party [can satisfy its] burden by 'point[ing] to the absence of evidence to support an essential element of the non-moving party's claim.'" *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. 1104, 1108 (N.D.N.Y.1992) (applying standard to defendant's motion for summary judgment in defamation action) (quoting *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988)). Once the moving party has met its burden, "[t]he non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). The court's function is to determine whether genuine issues of fact exist, not to decide them: " 'Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich,* 99 F.3d at 522 (quoting *Gallo v. Prudential Residential Svcs.,* 22 F.3d 1219, 1224 (2d Cir.1994)).

## Defamation

Under New York law, a plaintiff seeking damages for libel must plead and prove four elements: (1) a defamatory state-

ment of fact;[2] (2) about the plaintiff; (3) publication to a third party; (4) injury. *See Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61 (2d Cir.1993) (discussing slander requirements under New York law). Whether a statement is susceptible of a defamatory construction is a question of law. *See Aronson v. Wiersma,* 65 N.Y.2d 592, 593–94, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (N.Y.1985). In making this determination, the court is not to seek out a defamatory meaning:

> The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction.

*Id.* at 594, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (citations omitted). In *Aronson,* the court held that the expression of unhappiness with an employee's performance was not libelous as a matter of law. *See id.* In *James v. Gannett Co.,* 40 N.Y.2d 415, 419–20, 386 N.Y.S.2d 871, 353 N.E.2d 834 (N.Y.1976), the court found that the statement "Men is my business" was not defamatory, because in the context of the article about the plaintiff (a belly dancer), it was clear that her remark meant that men came to her show to see her dance and talk to her, and that it was not reasonable to infer from this statement that she was a prostitute. Conversely, in *Carney v. Mem'l Hosp. and Nursing Home of Greene County,* 64 N.Y.2d 770, 772, 485 N.Y.S.2d 984, 475 N.E.2d 451 (N.Y.1985) the court held that the statement that a hospital employee had been dismissed "for cause" was susceptible to a defamatory connotation, and, therefore, the question of whether it was in fact defamatory was a question for the jury.

Related to their contention that the statements are not defamatory, defendants also argue that the plaintiffs' complaint is deficient because it does not plead special damages. Plaintiffs initially captioned this cause of action "trade libel." In New York, trade libel is the disparagement of a business's goods or services. It requires a showing of false, defamatory statements published to a third party, malice, and special damages. *See Kirby v. Wildenstein,* 784 F.Supp. 1112, 1115 (S.D.N.Y.1992). The gravamen of trade libel is revealed by its alternative name: product disparagement. *See id.* It does not protect the reputation of the business as such. *See Ruder & Finn, Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 670–71, 439 N.Y.S.2d 858, 422 N.E.2d 518 (N.Y.1981). Here, the gist of the plaintiffs' complaint is that the statements "falsely impugned the basic trustworthiness and integrity of [their] business...." Compl. ¶ 110. As a result, these claims do not sound in trade libel, but rather, in a claim for reputational injury to their business.

Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties. *See Liberman v. Gelstein,* 80 N.Y.2d 429, 436, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y. 1992) (holding that a statement that does not reflect upon a person's competence in their role, rather than as a person, is not defamatory as to that person's business); *see also Carney,* 64 N.Y.2d at 772, 485 N.Y.S.2d 984, 475 N.E.2d 451 (holding that a statement that might suggest plaintiff is incompetent has pled a valid libel cause of action). Thus, the statement need not subject a person or business to ridicule or similar contempt; however, the statement must impugn the plaintiff's ability to perform his or her specific occupation. *See Liberman,* 80 N.Y.2d at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344. Because a statement impugning the plaintiff's business reputation is libel *per se,* special damages need not be pled. *See Ruder & Finn,* 52 N.Y.2d at 670, 439 N.Y.S.2d 858, 422 N.E.2d 518. A statement may be shown to be libelous *per se* by pleading extrinsic

---

**2.** The parties do not dispute that the statements are "sufficiently factual to be susceptible of being proved true or false." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990) (construing Federal defamation standards); *see also 600 West 115th Street Corp.*

*v. Von Gutfeld,* 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 603 N.E.2d 930 (N.Y.1992) ("Under either Federal or State law, the dispositive question is whether a reasonable [reader] ... could have concluded that [the defendant] was conveying facts about the plaintiff.").

facts that are "presumably known" to the readers of the statement. *Hinsdale v. Orange County Publications, Inc.,* 17 N.Y.2d 284, 290, 270 N.Y.S.2d 592, 217 N.E.2d 650 (N.Y.1966).[3] A statement that alleges a single instance of mistake or other error is usually not libel *per se. See November v. Time Inc.,* 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (N.Y.1963). In *John Langenbacher Co., Inc. v. Tolksdorf,* 199 A.D.2d 64, 605 N.Y.S.2d 34 (2d Dep't 1993), the court affirmed a decision that found that the former owner of a firm defamed the company when he told others in his field that his former company would suffer "financial problems, be operated by incompetents and would be unable to fulfil its commitments as to quality and time." *Id.* at 64–65, 605 N.Y.S.2d 34. A statement that a company is insolvent is defamatory because it is a statement of a kind that "force[s] the assumption that business would be lost because of the publication." *Medina v. United Press Associations,* 16 Misc.2d 876, 877, 185 N.Y.S.2d 366 (Sup.Ct.N.Y.Cty.1959).

 Applying these precedents, the Gill letter is not defamatory as a matter of law. Plaintiffs allege that the statements are defamatory because they impugn the ability of the firm to perform. This claim fails for several reasons. First, the letter explicitly states that the defendants' concern springs from the fact that Van–Go has informed the BOE that it cannot pay the higher wages "typically demanded by Local 1181 *under the current terms of [the] contract.*" Defs.' Ex. D (emphasis added). Thus, the letter refers to a single issue, about a single contract. There is no indication that the BOE or Gill is suggesting that Van–Go is generally untrustworthy or incapable of performing its contracts. Had the letter simply stated that the plaintiffs cannot perform the contract if they must pay higher wages it would fall within the rule that a statement alleging a single mistake or error is not actionable. *See November v. Time, Inc.,* 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (N.Y.1963).

Additionally, the letter is not defamatory because taken as a whole it does not impugn plaintiffs' business. The letter does state that because Local 1181 will succeed in its organization of Van–Go's employees, there will be an "inevitable job action" and a possible "disruption of service." Without more, the statement might well be susceptible of a defamatory meaning, at least at this stage in the proceedings. However, a statement must be judged in the context of the entire communication. *See James v. Gannett Co.,* 40 N.Y.2d 415, 419–20, 386 N.Y.S.2d 871, 353 N.E.2d 834 (N.Y.1976). The same letter states: "The school bus company [Van–Go] currently providing this service ... provides excellent service to the children. Normally we would have no reason to bid this work." Gill Ltr. The letter also states: "Bidders should also be aware that in the event there is no job action, we do not intend to make an award." *Id.* The assertion by plaintiffs that these statements are defamatory is directly contradicted by the praise for Van–Go, coupled with the statement that if there is no action, then there will be no award of the contract. Taken in its worst light, the statements only imply that due to forces beyond Van–Go's control it may be unable to fulfill its contract. This is not a libelous statement about plaintiffs' business, however, because the basis for the statement is the act of an external factor over which Van–Go has no control: Local 1181. When read with the entire statement it is clear that no impugning of plaintiffs' business is evident. Nor do any of the extrinsic facts pleaded in the complaint render the statements libelous, for even if all the facts pled in the complaint were known to the recipients of the Gill letter, its import would still be the same. Only a strained and highly implausible reading of the letter could permit a defamatory meaning to emerge, and so this statement is not defamatory as a matter of law.

 The Scarpa letter presents several different issues. Unlike the Gill letter, the

---

**3.** In *Hinsdale,* the court held that a cause of action for libel had been made out where a newspaper published an announcement of an impending marriage, but the parties named were already married to other persons. The court held that in the context of a small town, "a fact not expressed in the [local] newspaper but presumably known to its readers is part of the libel." *Hinsdale,* 17 N.Y.2d at 290, 270 N.Y.S.2d 592, 217 N.E.2d 650.

Scarpa letter contains language that is undoubtedly capable of a libelous interpretation. "[T]he possibility of criminal activity constituting the offer of gratuities to government officials" is an allegation of a serious offense—bribery—made against the principals of Van–Go, and is actionable. *See Liberman v. Gelstein,* 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.1992) (holding that defendant's statement that plaintiff has a " 'cop on the take ...' charges a serious crime—bribery" that is actionable).

 Defendants argue that plaintiffs have suffered no damages, citing the fact that Celebrity has since been awarded a contract by the City. However, when the action is for libel *per se,* as it is here, the injury is presumed. *See Ruder & Finn, Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 422 N.E.2d 518 (N.Y.1981) ("Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed.") Plaintiffs need not plead special damages. *See id.; see also Yesner v. Spinner,* 765 F.Supp. 48, 52 (E.D.N.Y.1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se', and therefore actionable without any proof of special damages.") (citing cases). Presumed damages are not limited to "out-of-pocket loss but, rather, also include[ ] impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering." *Wachs v. Winter,* 569 F.Supp. 1438, 1446 (E.D.N.Y.1983) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974) and holding that "where the language alleged is libelous per se, the plaintiff need not plead or prove special damages in order to recover them.") (footnote and citation omitted). Even where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages. *See Meehan v. Snow,* 494 F.Supp. 690, 695–96 (S.D.N.Y.1980), *reversed on other grounds,* 652 F.2d 274 (2d Cir.1981) (awarding compensatory damages to lawyer who had been slandered even though lawyer's

business increased after the defamatory statement); *see also Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976) (awarding one dollar in compensatory damages).

### Publication

The defendants also argue that the plaintiffs are barred from bringing a defamation action because the plaintiffs themselves placed the defamatory matter into the City's Vendex system. Put differently, they argue that the plaintiffs' compliance with the City's bidding requirements should be construed as a consent to the publication, barring their claim. Because this defense raised the novel issue of compelled self publication, the parties were asked to discuss publication by means of reproduction in the City's Vendex system.

A business must submit a Vendex questionnaire when it submits a bid for a contract for more than $100,000.00, or for a bid of more than $10,000.00 awarded through a sole source procedure, or when the aggregate business of the contractor totaled more than $100,000.00 for the prior year, or if the entity wishes to be placed on a prequalified list. *See* "A Vendor's Guide to Vendex" ("Guide") at 1, attached to Ltr. to court from Susan Shapiro, Esq. counsel for defendants dated May 2, 1996 ("Shapiro Ltr."); 9 R.C.N.Y. § 5–02.

Persons wishing to contract with the City are instructed to list on the Vendex questionnaire all incidents of contract denials, suspensions, terminations, rejections and the basis for those actions. *See* Business Entity Questionnaire ("BEQ") Question 12, attached to Shapiro Ltr. Additionally, the questionnaire requires information on criminal and civil investigations within a five year period. Significantly, the Guide states that when answering Question 17, "if you suspect that the submitting business, its principal owners and officers and/or its affiliates were the subject of an investigation but are unsure, answer 'Yes' and attach an explanation of the reasons for your suspicion(s)." Guide at 8. The Guide further states that a statement that is materially false and fraudulently or willfully made "in connection with this questionnaire

may result in rendering the business submitting the questionnaire non responsible [sic] with respect to the present bid or future bids, and in addition, may subject the person making the false statement to criminal charges." Guide at 9. Persons answering "Yes" to questions about contract incidents or investigations must fully explain their answers.

The forms for Celebrity and both Dachs listed the reason for denial of Celebrity's contract as "qualified bid and unsubstantiated allegation of offering gratuity to inspector." "Principal Questionnaire" for Paul Dachs ("Dachs PQ") at 7, attached to Shapiro Ltr. Printouts of the information displayed on the Vendex program computer screens for plaintiffs indicate that this information appeared in data files on all of the plaintiffs, but in modified form. Despite the statement by the Board of Review that the bribery allegation would not be considered at the hearing, and presumably would not be at issue, the Vendex system lists "bribery" as the reason for the denial of the bid, and a comments field displays the language plaintiffs used: "qualified bid and allegation of offering grat[uity]." Vendex VDMXQ802, attached to Shapiro Ltr.

Defendants make several arguments regarding Vendex publication. First, they assert that the Vendex notices are not punitive because the purpose of the system is to allow the City to "make well-informed decisions with respect to those with whom it contracts." Shapiro Ltr. at 3. This argument misses the mark. There is no doubt that the City can establish the Vendex system for the legitimate purpose of monitoring its contracting relationships. *Cf. Sanitation and Recycling Ind., Inc. v. City of New York,* 107 F.3d 985, 990–94 (2d Cir.1997) (upholding city's

carting regulatory scheme); *Valmonte v. Bane,* 18 F.3d 992, 1003 (2d Cir.1994) (noting that state has a strong interest in maintaining centralized child abuse registry); *Lee TT v. Dowling,* 87 N.Y.2d 699, 708–9, 642 N.Y.S.2d 181, 664 N.E.2d 1243 (N.Y.1996) (holding that state's registry of suspected child abusers is a legitimate exercise of the police power).

That power, however, is not limitless. As the Court of Appeals for the District of Columbia Circuit stated in a similar context: "Thus to say that there is no 'right' to government contracts does not resolve the question of justiciability. Of course there is no such right; but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person...." *Gonzalez v. Freeman,* 334 F.2d 570, 574 (D.C.Cir.1964). While it may well be that to be effective, a system like Vendex must inevitably contain defamatory matter, nothing in New York law supports the proposition that the power to establish the Vendex system confers an unqualified right to defame.[4]

Defendants make two additional arguments regarding publication, one of which appears to be an open question under New York law. First, they assert that there can be no liability because the plaintiffs effectively consented to the publication of the statements. Second, they argue that even if publication is found, that the statements are subject to a qualified privilege, and that, therefore, liability cannot attach. In response, plaintiffs argue that because they merely repeated what Scarpa's letter stated, and because the BOE knew that the plaintiffs were required to report the unsubstantiated allegations in the Scarpa letter, *see* Ltr. to court from Robert J. Jossen, Esq. counsel

---

4. In *Valmonte v. Bane,* 18 F.3d 992 (2d Cir.1994) and *Lee TT v. Dowling,* 87 N.Y.2d 699, 642 N.Y.S.2d 181, 664 N.E.2d 1243 (N.Y.1996), the Court of Appeals for the Second Circuit and the New York Court of Appeals respectively held that the reporting procedures established for New York State's Central Register for child abuse violated procedural due process. Specifically, both courts held that although the state had a legitimate interest in maintaining a registry of child abusers, the low standard of evidence required for inclusion in the registry ("some credi-

ble evidence") produced an unacceptably high risk of erroneous inclusion, with severe negative consequences to the affected individual. *See Valmonte* at 1004; *Lee TT,* at 708, 642 N.Y.S.2d 181, 664 N.E.2d 1243. While these cases arose in the context of procedural due process, the courts' concern for risk of error underscores the potential for injury—inadvertent or otherwise—that inheres in any governmental scheme to collect information. Moreover, while a name clearing remedy is available under the abuse registry, the Vendex scheme lacks a similar opportunity.

to plaintiffs dated May 24, 1996, the fact of their publication of the allegations should not be seen as manifesting consent.

■ Publication of a libel to a third party is a necessary element of a defamation claim. *See Youmans v. Smith*, 153 N.Y. 214, 218, 47 N.E. 265 (N.Y.1897). Publication occurs when the libelous words are read "by someone other than the person libeled and the person making the charges." *Fedrizzi v. Washingtonville Cent. Sch. Dist.*, 204 A.D.2d 267, 268, 611 N.Y.S.2d 584 (2d Dep't 1994). To be liable for defamation, the defendant must induce or cause publication in some fashion; a person who makes a defamatory remark is not liable for its repetition if they have no control over the publication. *See Schoepflin v. Coffey*, 162 N.Y. 12, 17, 56 N.E. 502 (N.Y.1900). In New York, consent to publication is a bar to a defamation action. *See Teichner v. Bellan*, 7 A.D.2d 247, 251, 181 N.Y.S.2d 842 (4th Dep't 1959). This rule is subject to the important qualification that a plaintiff who authorizes an inquiry is not to be deemed to have consented unless she has reason to think that the statement will be defamatory. *See id.*

■ Plaintiffs' defamation claim is best seen as one for compelled self publication, a narrow exception to the rule of no liability. This concept embraces several theories. A defendant may be liable for defamation if the defendant " 'knew or could have foreseen that the plaintiff would be compelled to repeat the defamatory statement.' " *J. Crew Group, Inc. v. Griffin*, No. 90 Civ. 2663, 1990 WL 193918 at *2 (S.D.N.Y. Nov.27, 1990) at *2 (quoting *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1344 (Colo.1988) (en banc)). The second theory " 'imposes liability if the defendant knew or could have foreseen that the plaintiff was likely to repeat the statement.' " *J. Crew*, at *2 (quoting *Churchey* at 1344). Another approach is suggested by the Restatement (Second) of Torts, which finds publication to have occurred when a defamed plaintiff communicates a defamatory statement "without an awareness of the defamatory nature of the matter and if the circumstances indicated that communication to a third party would be likely...." Restatement (Second) of Torts § 577 cmt. m (1976).

Generally, the issue of compelled self publication arises in employee termination cases, where the terminated plaintiff asserts that she is compelled to repeat the defamatory statement in the process of applying for a new job. *See Lewis v. Equitable Life Assurance Society of the United States*, 389 N.W.2d 876, 886 (Minn.1986) (collecting cases). The argument is essentially a proximate cause one:

> The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed.

*McKinney v. Santa Clara County*, 110 Cal. App.3d 787, 797–98, 168 Cal.Rptr. 89 (1st Dist.1980). Most courts that have endorsed the theory have adopted a standard composed of compulsion and foreseeability rather than a standard that allows liability on a lesser showing of likelihood or reasonableness. *See, e.g., Chrzanowski v. Lichtman*, 884 F.Supp. 751, 755 (W.D.N.Y.1995); *J. Crew Group*, at *3; *Elmore v. Shell Oil Co.*, 733 F.Supp. 544, 546 (E.D.N.Y.1988); *Lewis*, 389 N.W.2d at 888 (holding that liability exists only where "defamed person has no reasonable means of avoiding publication of the statement or avoiding the resulting damages").

There is scant law on this issue in New York. In a memorandum decision, *Wieder v. Chemical Bank*, 202 A.D.2d 168, 170, 608 N.Y.S.2d 195 (1st Dep't 1994), *lv. to appeal denied*, 83 N.Y.2d 759, 615 N.Y.S.2d 876, 639 N.E.2d 417 (1994), the First Department flatly rejected a claim of compelled self publication in the case of a lawyer who was discharged for misconduct. However, the *Weider* decision rests on the holding in *Weintraub v. Phillips, Nizer, Benjamin, Krim, & Ballon*, 172 A.D.2d 254, 255, 568

N.Y.S.2d 84 (1st Dep't 1991). The facts of this case did not demonstrate compelled self publication, *see Wright v. Guarinello,* 165 Misc.2d 720, 724, 635 N.Y.S.2d 995 (Sup.Ct. Kings Cty.1995), nor was the issue of compelled self publication actually considered.[5]

More recently, a trial court adopted the self publication rationale, although it limited the relief to a name-clearing hearing. In *Wright v. Guarinello,* 165 Misc.2d 720, 635 N.Y.S.2d 995 (Sup.Ct.Kings Cty.1995), plaintiff Wright brought an Article 78 proceeding following his termination by a social service agency against the state Office of Mental Retardation and Developmental Disabilities. Wright was terminated for "misconduct" after a report that he improperly handled a disabled person. Pursuant to state regulations Wright's employer was required to report this charge of abuse. Wright argued that he was faced with the choice between failing to disclose information that was available through a state maintained system and full disclosure, which would result in his inability to obtain a job. *See id.* at 721–22, 635 N.Y.S.2d 995. The court ordered a name clearing hearing and suggested that the theory of compelled self publication should be adopted in New York, at least in a situation where a potentially defamatory statement must be reported:

> Nothing in the 100–year history of "at will" employment permits an employer to go beyond the boundary of ending one employment by inventing a knowingly false charge that it can foresee will foreclose any future employability, where the circumstances bespeak a strong compulsion by the employee to self-publish the stated grounds. A license to fire at will does not carry with it permission to poison with immunity.

*Id.* at 725, 635 N.Y.S.2d 995. While this case, (like *Valmonte* and *Lee TT*) is concerned with the harm that flows from disclosure to third parties, that fact is not dispositive here. The critical similarity between

*Wright* and this case is the plaintiff's lack of control over the publication.

Interestingly, there is more law in the Second Circuit discussing the application of this doctrine in New York, but there is no consensus on its application. The Eastern District has recognized the doctrine. *See Elmore v. Shell Oil Co.,* 733 F.Supp. 544, 546 (E.D.N.Y.1988). In *Elmore* the court held that a plaintiff fired after being accused of wrongdoing stated a claim for compelled self publication because he would be unable to fabricate a story about his sudden discharge after 15 years of employment. *See id.* The doctrine was also adopted in the Western District, in *Weldy v. Piedmont Airlines,* No. CIV–88–628E, 1989 WL 158342 (W.D.N.Y. Dec.22, 1989) (Elfvin, J.), where the court stated its belief that the New York Court of Appeals would adopt this doctrine:

> In this Court's view, New York's Court of Appeals, if confronted with this case, would choose to recognize the compelled self-defamation claim.... The direction of modern authority is plainly toward the recognition of a claim for compelled self-defamation. Indeed, it appears that every court which has considered the question on its merits has adopted the doctrine. This is because such doctrine is in no respect a radical departure from conventional principles of tort law.

*Id.* at *6.

The Southern District has repeatedly considered the question but has not arrived at a consensus. In *Mandelblatt v. Perelman,* 683 F.Supp. 379, 386 (S.D.N.Y.1988), the court discussed the doctrine in some detail, but found it unnecessary to decide whether New York would adopt it. In *Burger v. Health Ins. Plan of Greater New York,* 684 F.Supp. 46, 52 (S.D.N.Y.1988), the court declined to exercise pendent jurisdiction over a defamation claim, holding that on such a matter of important policy, a New York court should make the initial decision. In *J. Crew Group,*

---

5. The *Weintraub* decision cites *Church of Scientology of California, Inc. v. Green,* 354 F.Supp. 800, 804 (S.D.N.Y.1973) for the proposition that New York does not recognize a defamation cause of action for self publication. That case, however, found that there had been no publication where the plaintiff apparently mailed copies to third parties of a notice from the Church informing him of his removal. *See Church of Scientology* at 804. Compelled self publication was not raised as an issue.

the court held that the plaintiff failed to state a claim under the *Weldy* formulation. *See J. Crew Group*, at *4. The court in *McNabb v. MacAndrews & Forbes Group, Inc.*, No. 90 Civ. 5482, 1991 WL 284104 (S.D.N.Y. Dec.24, 1991) also "decline[d] to speculate on or meddle in a developing area of state law," *id.* at *3, and a similar result was reached in *Mendoza v. SSC & B Lintas*, 799 F.Supp. 1502, 1512 (S.D.N.Y.1992). The doctrine was discussed in *Metchick v. Bidermann Indus. Corp.*, No. 91 Civ. 2329, 1993 WL 106139 (S.D.N.Y. April 7, 1993), but was decided on the ground that the plaintiff failed to show facts that would support a claim under the Restatement's definition.[6] *See id.* at *5. However, in *Tischmann v. ITT/Sheraton Corp.*, 882 F.Supp. 1358 (S.D.N.Y.1995) the court held that New York does not recognize compelled self publication. *See id.* at 1370 (citing *Wieder v. Chemical Bank*, 202 A.D.2d 168, 608 N.Y.S.2d 195 (1st Dep't 1994)).

In reviewing these cases, two trends seem apparent. When actually required to decide, most federal district courts hold that New York would adopt the doctrine of self-publication. Further, they largely agree that the *Weldy* formulation is the proper one, and that properly understood it requires a plaintiff to show both foreseeability and compulsion. *See, e.g., J. Crew Group*, at *4.

■ It seems reasonable to assume that the New York Court of Appeals would adopt the doctrine in a form that allowed for liability where, such as in the instant case, there was a high degree of compulsion that required the reporting of the defamatory matter. Because of the Court of Appeals's historic concern for unlimited liability, however, the doctrine may be subject to qualification. *See, e.g., Tobin v. Grossman*, 24 N.Y.2d 609, 612, 301 N.Y.S.2d 554, 249 N.E.2d 419 (N.Y. 1969). The court might be more likely to adopt an approach limiting defamation claims where some consent to publication existed to only those claims where plaintiffs could show a lack of control over the publication. *See Schoepflin v. Coffey*, 162 N.Y. 12, 17, 56 N.E. 502 (N.Y.1900). Implicit in the concept of consent is the conception that the consenting party have the power to control the publication. *See id.* Thus, there can be no finding of consent where, as here, there is no effective control over the dissemination of the defamatory material. This approach would accord with older New York cases. *See, e.g., Schoepflin* at 17, 56 N.E. 502; *see also Mandelblatt v. Perelman*, 683 F.Supp. 379, 383 (S.D.N.Y.1988) (noting that under New York law consent to a publication does not entail consent beyond the scope of the consent).

■ Assuming that New York would adopt such a cause of action, plaintiff has sufficiently pled both elements of compelled self publication. Given the structure of the Vendex system, it was foreseeable that the allegation would be reproduced by plaintiffs. The element of compulsion also exists, inasmuch as plaintiffs would be required to report the reason for their failure to obtain the bid when submitting a new bid. The fact of plaintiffs' consent to the Vendex system does not establish an absolute bar. *See Mandelblatt* at 683. A contractor's desire to compete for government contracts does not strip that contractor of all rights any more than it can cloak irrational, arbitrary, or malicious government action with total immunity. Thus, plaintiffs have established publication.

### Privilege

■ Assuming for the purposes of this motion that the bribery allegation is false, defendants argue that the statement was, nonetheless, privileged. "Qualified privilege attaches to otherwise actionable defamatory words when '[a] communication [is] made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty ... if made to a person having a corresponding interest or duty.'" *Elmore v. Shell Oil Co.*, 733 F.Supp. 544, 546 (E.D.N.Y.1988) (quoting *Shapiro v. Health Ins. Plan of Greater New York*, 7 N.Y.2d 56, 60, 194 N.Y.S.2d 509, 163 N.E.2d 333 (N.Y.1959)). To assert a qualified privilege, a party "must establish that the allegedly defamatory state-

---

**6.** The *Weldy* court rejected the Restatement approach, holding that requiring a plaintiff to be unaware that the statement that she publishes is defamatory is an "effectively eviscerated" cause of action. *Weldy*, 1989 WL 158342 at *6.

ment was made upon an occasion furnishing a prima facie justification for its publication." *Garson v. Hendlin*, 141 A.D.2d 55, 61, 532 N.Y.S.2d 776 (2d Dep't 1988) (citations omitted).

 Here, the relevant communication is between Scarpa and the other users of the Vendex system, presumably City agencies. The statement made by Scarpa is precisely of the kind that a privilege is intended to cover: a statement alleging bribery of a government official would be an allegation that City agencies attempting to award contracts to responsible bidders would wish to be informed of, and it is a matter of common concern.[7]

 A qualified privilege is not, however, unlimited: "The shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice.'" *Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.1992) (citation omitted). Plaintiffs argue that because they have pled that defendants acted with malice, the privilege is overcome. However, merely asserting that the defendants acted with malice is not sufficient, for an allegation of malice "must be supported by sufficient evidentiary facts." *Shamley v. ITT Corp.*, 869 F.2d 167, 173 (2d Cir.1989) (applying New York law).

 Two types of malice are recognized: actual malice, which the Supreme Court has defined as "'knowledge that [the statement] was false or ... reckless disregard of whether it was false or not,'" *Liberman v. Gelstein*, 80 N.Y.2d 429, 438, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.1992) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)), and common law malice, defined as meaning "spite or ill will." *Liberman*, 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344. Either form of malice will dis-

solve a qualified privilege. *See id.* at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344. Under the actual malice standard, a plaintiff must show, at a minimum, that the defendant is aware that the statement is probably false. *See id.* (holding that under Supreme Court standard, defendant's admission that he did not know if a bribery allegation was in fact true did not raise a triable issue regarding actual malice). Neither the defendant's ill will, nor a failure to investigate the veracity of the allegation will establish actual malice. *See, e.g., World Boxing Council v. Cosell*, 715 F.Supp. 1259, 1266–67 (S.D.N.Y.1989) (citing cases). A failure to investigate a statement may give rise to an inference of malice if the failure to investigate amounts to a "purposeful avoidance," that is, conduct that "evinces an intent to avoid the truth." *Sweeney v. Prisoners' Legal Servs. of New York, Inc.*, 84 N.Y.2d 786, 793, 622 N.Y.S.2d 896, 647 N.E.2d 101 (N.Y.1995) (citing *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692, 693, 109 S.Ct. 2678, 2698, 2698–99, 105 L.Ed.2d 562 (1989)).

Plaintiffs' argument that malice can be reasonably inferred from the facts averred in the complaint is unavailing, because while plaintiffs repeatedly assert that the defendants acted with malice or reckless disregard, nowhere in plaintiffs' complaint are there facts that would reasonably allow an inference of actual malice to be drawn. Actual malice cannot be inferred from the fact that Scarpa's letter states the allegations in a qualified fashion because "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Liberman*, 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344. Here, plaintiffs have not pled facts to permit the inference that Scarpa was "highly aware"

---

**7.** In determining whether a bidder is responsible, a city official is directed to consider "information supplied by the prospective contractor, including bid or proposal information, Vendex and prequalification questionnaire replies...." 9 R.C.N.Y. § 5–02(g)(iv).

If a low bidder is determined to be non-responsive, "the Contracting Officer shall promptly notify the lowest bidder in writing of that determination. The notification shall state the reasons upon which the determination is based and, where applicable, shall inform the bidder of the right to appeal the determination of non-respon-

that the statement was false.[8] Nor have plaintiffs pled any facts that would allow the inference that Scarpa acted in reckless disregard of the statement's truth, or, knowing the statement was false, that he failed to investigate it in a fashion that could amount to purposeful avoidance. Plaintiffs' complaint fails to set forth facts that would allow an inference of actual malice.

Plaintiffs' complaint fares no better under a common law malice analysis. In *Shapiro v. Health Ins. Plan of Greater New York*, 7 N.Y.2d 56, 194 N.Y.S.2d 509, 163 N.E.2d 333 (N.Y.1959), the Court of Appeals established that in the context of a summary judgment motion, a plaintiff's affidavit that alleged malice and demonstrated prior conflicts between himself and defendants was insufficient to overcome a qualified privilege:

> While there are numerous cases in the books in which it is said that as to privileged communications the good faith of the defendant and the existence of actual malice are questions of fact for the jury, the expression must not be misunderstood. Those questions are for the jury only where there is evidence in the case warranting their submission to the jury and the burden of proof is on the plaintiff. Falsity is not sufficient for an inference of malice. "It must be ... consistent only with a desire to injure the plaintiff to justify ... [sending] the question of malice to the jury.... By actual malice is meant 'personal spite or ill will, or culpable recklessness or negligence.'"

*Id.* at 61, 194 N.Y.S.2d 509, 163 N.E.2d 333 (internal quotation and citations omitted). The New York Court of Appeals found that plaintiff's allegation that defendants were motivated by malice was insufficient in the face of an investigation by the defendants into plaintiff's alleged incompetence. *See id.* at 64, 194 N.Y.S.2d 509, 163 N.E.2d 333. Thus, plaintiffs must proffer sufficient facts

to allow a jury to infer that "malice [is] the one and only cause for the publication." *Stukuls v. State*, 42 N.Y.2d 272, 282, 397 N.Y.S.2d 740, 366 N.E.2d 829 (N.Y.1977) (citation omitted).

 New York courts have held that malice may be inferred in a variety of situations. A statement made in the course of a communication that is not necessary to the interest furthered by the communication will support an inference of malice. *See Herlihy v. Metropolitan Museum of Art*, 214 A.D.2d 250, 259–60, 633 N.Y.S.2d 106 (1st Dep't 1995) (holding that malice "may be inferred from a defendant's use of expressions beyond those necessary for the purpose of the privileged communication") (citation omitted). However, an otherwise defamatory communication that furthers the interest giving rise to the privilege will not permit an inference of malice, regardless of the libeler's feelings or ill will. *See Liberman*, 80 N.Y.2d at 439, 590 N.Y.S.2d 857, 605 N.E.2d 344. A rumor that is passed on as true, where the defendant is not under a duty to report such a rumor, will allow an inference of malice. In *Pecue v. West*, 233 N.Y. 316, 135 N.E. 515 (N.Y.1922), the defendant passed on as fact an unverified statement from an anonymous writer. The court held that malice could be inferred because the was no basis for the writer to assert the facts as such, and explicitly distinguished the case from the example of the transmission to a district attorney of "suspicions, rumors, or gossip." *Id.* at 323, 135 N.E. 515.

If Scarpa doubted the validity of the allegations, and there was no purpose in Scarpa's repeating the allegations, one could reasonably infer that the statement regarding the allegations exceeded the privilege in a fashion that would allow an inference of malice to be drawn. Here, however, the interest that gives rise to the disclosure is the same for both paragraphs: both inform the bidder

---

siveness to the Agency Head." 9 R.C.N.Y. § 7–02(b).

**8.** In their letter commenting on the Vendex system, plaintiffs' lawyer states that "the BOE well knew that the 'allegation' of bribery came from an untrustworthy 'labor-side' source during a heated labor dispute." Ltr. to court from Robert J. Jossen, Esq. counsel for plaintiffs dated May

24, 1996. Aside from the fact that the plaintiffs' declaration makes no mention of this incident, this statement—without more—does not support an inference of malice because there is no basis for inferring that if this "source" was the source of the allegation that Scarpa knew or should have known that the statement was likely false.

of reasons for the agency's determination that the bid will not be awarded to them. The fact that the second reason can be characterized as additional cannot support an inference of malice. The purpose of the Vendex system is precisely to gather all of the findings that an agency makes in the course of awarding bids and supervising contracts, as evidenced by the fact that the Vendex system requires bidders to report suspicions of investigations.[9] On this record, the fact that the allegation was characterized as an additional reason for denial does not permit an inference of malice.

 Summary judgment is, nevertheless, not proper on this record. Plaintiffs have not proffered evidence to overcome the qualified privilege, but they have not had the opportunity to depose Scarpa or other relevant parties on the issue of malice.[10] Plaintiffs have alleged that the BOE acted with malice. It is possible that Scarpa (or someone else in the agency) knew the allegation to be false, or included the allegation for gratuitous reasons. In *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994), the Court of Appeals for the Second Circuit held that a jury could reasonably infer that the defendant hospital employers lost their qualified privilege where they reported the plaintiff physician to the state. Although they reported plaintiff pursuant to statutes that provided for reporting for impairment, incompetence, or other forms of malpractice, and thus had a qualified privilege to make the communication, the privilege was lost because the jury reasonably found that the defendants did not make their report in good faith. Here, it is significant that while the defendants have submitted affidavits, they did not submit affidavits from either Gill or Scarpa. Thus, summary judgment as to the defamation claim flowing from the Scarpa letter is inappropriate at this time. Plaintiffs are entitled to the opportunity to gather evidence to overcome the qualified privilege. *See Elmore v. Shell Oil Co.*, 733 F.Supp. 544, 547 (E.D.N.Y.1988) (denying summary judgment to defendant and permitting discovery on issue of malice); *Liberman v. Gelstein*, 80 N.Y.2d 429, 438–39, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.1992) (holding that failure to depose witnesses for three years forecloses opportunity for further discovery on issue of malice); *Paskiewicz v. NAACP*, 216 A.D.2d 550, 551, 628 N.Y.S.2d 405 (2d Dep't 1995) (noting that summary judgment in a defamation case where a qualified privilege is asserted can be denied when "discovery might reveal the existence of material facts, currently within the exclusive knowledge and control of the defendants"), *lv. to appeal denied*, 87 N.Y.2d 807, 641 N.Y.S.2d 829, 664 N.E.2d 895 (1996).

Moreover, by failing to offer any evidence on this material point, defendants have failed to show that there is no genuine issue of material fact regarding malice, and, therefore, have not met their burden on this motion. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970).

## Conclusion

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part. The Gill letter is not defamatory as a matter of law, and summary judgment is granted to defendants on that portion of plaintiffs' claim. Summary judgment

---

9. In this connection, it is important to note that Vendex also contains information on contractor performance as well as bidder qualifications. Because plaintiffs are under a duty to report well founded rumors, Scarpa would presumably be under a similar duty to report such a rumor; indeed, one purpose of the Vendex system is to determine the fitness of a bidder. Thus, Rule § 5–02(f) requires an agency to ask the Department of Investigation to "review the names on the questionnaire *and other information* to ascertain whether the business or its affiliated individuals are or have, during a relevant period of time, been the subject of an investigation by the department." (emphasis added). Scarpa's publi-

cation of the rumor might be privileged even if he thought it might be false. *See Stukuls v. State*, 42 N.Y.2d 272, 283–5, 397 N.Y.S.2d 740, 366 N.E.2d 829 (N.Y.1977) (Jones, J., concurring) (discussing applicability of Restatement (Second) of Torts § 602 (1976), which provides that a person under a duty to publish a defamatory rumor acts within a qualified privilege if the rumor is identified as such and the publication is otherwise reasonable).

10. At the time of oral argument, there had been no depositions taken and no discovery regarding this motion. *See* 2/6/97 Tr. at 16.

on that portion of plaintiffs' claim arising from the Scarpa Letter is denied.