**Lino CELLE and Radio Mindanao Network USA, Inc., Plaintiffs–Appellees,**

v.

**FILIPINO REPORTER ENTERPRISES INC. and Libertito Pelayo, Defendants–Appellants.**

**No. 1601, Docket No. 98–9250**

United States Court of Appeals, Second Circuit.

Argued April 16, 1999

Decided April 12, 2000

---

Judah D. Greenblatt, New York, N.Y. (Greenblatt, Softness & Lesser, LLP, on the brief), for Plaintiffs–Appellees.

Michael D. Carlin, New York, N.Y. for Defendants–Appellants.

Before: JACOBS and STRAUB, Circuit Judges, and WEINSTEIN, Senior District Judge.*

Judge Jacobs dissents in a separate opinion.

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I INTRODUCTION ................................................171

II FACTS .....................................................172
 A Parties................................................172
 B Ty Litigation .........................................172
 C The Three Articles ....................................172
 1 First Article .....................................172
 2 Second Article.....................................173
 3 Third Article .....................................173
 D District Court Proceedings ............................173

III LAW .......................................................175
 A Choice ................................................175
 B Libel .................................................176
 1 Public Figures ....................................176
 2 Defamation ........................................177
 a Principles of Interpretation...................177
 b Defamatory Meaning ............................178
 c Opinion .......................................178
 d Defamatory Per Se .............................179
 e Single Instance Rule ..........................180
 3 Falsity ...........................................181
 4 Actual Malice .....................................182
 5 Punitive Damages ..................................184

IV APPLICATION OF LAW TO FACTS ...............................185
 A Form of Jury Charge ...................................185
 B Single Instance Rule..................................185
 C First Article .........................................185

---

* Senior District Judge Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation.

1 Defamation .......................................... 185
2 Falsity ............................................ 186
3 Actual Malice ...................................... 186
D Second Article ....................................... 187
1 Defamation ........................................ 187
2 Falsity ........................................... 188
E Third Article ........................................ 189
1 Defamation ........................................ 189
2 Falsity ........................................... 189
3 Actual Malice ..................................... 190
F Punitive Damages .................................... 190

V CONCLUSION ............................................ 191

## I. INTRODUCTION

This case illustrates the continuing difficulty in balancing protection of reputation and freedom to publish. *See* U.S. Const. amend. 1. The scale is calibrated by a combination of state libel law and federal First Amendment doctrine. *See, e.g., Hustler Magazine v. Falwell*, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) ("False statements of fact are particularly valueless; ... they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective. But even though falsehoods have little value in and of themselves, they are nevertheless inevitable in free debate, and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted chilling effect on speech relating to public figures that does have constitutional value. Freedoms of expression require breathing space." (internal quotation marks and citations omitted)); *Herbert v. Lando*, 441 U.S. 153, 203, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (Marshall, J., dissenting) ("States undeniably have an interest in affording individuals some measure of protection from unwarranted defamatory attacks. Libel actions serve that end, not only by assuring a forum in which reputations can be publicly vindicated and dignitary injuries compensated, but also by creating incentives for the press to exercise considered judgment before publishing material that compromises personal integrity."); *see generally* Thomas I. Emerson, *The System of Freedom of Expression* 517 (1971) ("[T]he law of libel seeks to protect various individual interests against injury resulting from false and defamatory communication. It runs squarely into the right to freedom of expression.").

■ Both trial and appellate judges are obliged to exercise a heightened standard of jury supervision in protecting the media's freedom of speech while taking steps to ensure that this freedom is not abused to injure others. *See, e.g., Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) ("[I]n cases raising First Amendment issues ... an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that the 'judgment does not constitute a forbidden intrusion on the field of free expression.' "); *cf. Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 88, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Stewart, J., dissenting) ("[Courts] must never forget that the consequences of rigorously enforcing the guarantees of the First Amendment are frequently unpleasant. Much speech that seems to be of little or no value will enter the market place of ideas, threatening the quality of our social discourse and, more generally, the serenity of our lives. But that is the price to be paid for constitutional freedom.").

Here the jury found that the individual plaintiff and his radio station had been libeled in three newspaper articles published by the individual defendant and his newspaper. Although the jury concluded that plaintiff had not suffered actual dam-

ages, it awarded $1.00 in nominal damages and $15,000 in punitive damages.

The finding of libel as to the first and third articles was sufficiently supported by the evidence. The finding of libel with respect to the second article was not supported by the evidence as analyzed under the demanding standards of New York's libel law and the First Amendment.

Despite this partial failure of proof, the $1.00 nominal damages award as to the first and third articles is affirmed. Moreover, the jury had ample evidence to support the conclusion that defendants acted with malice and ill will towards plaintiffs in publishing the first and third articles. Given the failure of proof with respect to the second article, however, the punitive damages award is excessive by the amount of $5,000.

## II. FACTS

### A. Parties

Plaintiff-appellee Lino Celle is a radio commentator at Radyo Pinoy. His listeners come mainly from the Filipino–American community of the New York City area and northern New Jersey (the "Metropolitan" area). Radyo Pinoy is a "side carrier,"—in order to listen to its programs a special radio is required to pick up its frequency. Celle is also the president of Radyo Pinoy's owner, plaintiff-appellee Radio Mindanao–USA, Inc. ("RMN–USA"), and a columnist for the newspaper *Headline Philippines.*

Catering to the same community as Celle, defendant-appellant Libertito Pelayo is the editor-in-chief and a journalist for the newspaper *Filipino Reporter.* Pelayo is also president of defendant-appellant Filipino Reporters Enterprises, Inc., which owns and operates the *Filipino Reporter.*

Pelayo and Celle share a disaffection for one another resulting in part from their operation of competing media for the Metropolitan Filipino–American community. It was exacerbated by newspaper articles Celle wrote in 1995 and 1996 about a criminal conviction of Pelayo's daughter.

### B. Ty Litigation

Some of the libel claims at issue relate to Pelayo's reporting of an otherwise unrelated defamation suit brought by one Magdalena Ty against Celle and Radyo Pinoy. Ty alleged that during a February 1995 radio broadcast Celle described her as a "swindler," a "cheat," and "itchy." She claimed that Celle's insults were prompted by his (in her view, erroneous) belief that she had failed to pay for advertising spots broadcast by Radyo Pinoy.

Celle and RMN–USA moved for summary judgment in the Ty case. The court denied the motion in an opinion dated April 9, 1997, ruling that there were genuine issues of material fact as to whether, in making the allegedly defamatory statements about Ty, Celle had been negligent. *See Ty v. Celle,* No. Civ. 95–2631, 1997 WL 167041, at *2–3 (S.D.N.Y. April 9, 1997). The opinion also declared that there were genuine issues of material fact as to whether Celle's statements about Ty—including his suggestion that she welshed on her debts—were truthful. *Id.*

### C. The Three Articles

This suit arises out of three articles published in two consecutive issues of the weekly *Filipino Reporter.* The seven statements that form the basis for plaintiffs' action are emphasized in the text below, and identified by bullet points.

#### 1. First Article

On April 11, 1997, the *Filipino Reporter* published a front page article reporting the Ty summary judgment decision. The main headline of the article read: "Pinoy radioman's trial for libel going to a jury." Beneath the main headline was another (smaller) sub-headline. It and the first sentence of the article constitute the first statement at issue in the article:

● *US judge finds Celle "negligent"*

*A United States district judge found Radio Pinoy announcer Lino Celle "negligent"* in making defamatory statements against a Filipino businesswoman in his radio show, and dismissed Celle's motion for summary judgment in a 10–page opinion and order issued April 8, 1997. *(emphasis added)*.

The article continued: The judge "gave weight to plaintiff Magdalena (Kathy) Ty['s] testimony that she is not a cheater or a swindler, and that she never fooled retailers as Celle charged in his radio program."

The second statement at issue in the article followed:

● Moreover, [the judge] said, Ty claimed that she did not owe RMN (Radio Mindanao Network) money for advertisements and *"therefore Celle's statements implying that she failed to pay her debts to RMN were false."* (emphasis added).

#### 2. Second Article

In response to the April 11 article, Celle issued a press release and called approximately one hundred news outlets, threatening to sue if they did not discontinue sales of the April 11 edition of the *Filipino Reporter*.

Celle's actions were the basis of the second article which appeared on the front page of the April 25, 1997 edition of the *Filipino Reporter*. It was entitled "Store owners defy radioman's threats," and opened with the first statement at issue:

● *Alarmed by dwindling listeners, advertisers* and an ongoing lawsuit, a controversial New Jersey based radio announcer last week took a last-ditch desperate act by scaring outlets with lawsuits if they distributed copies of **The Filipino Reporter** containing a factual report of a court decision rejecting his motion to dismiss a $5 million defamation suit slapped against

him. (emphasis added) (bold in original).

The second statement at issue read:

● Store outlets throughout the metro New York and New Jersey area ignored the *black propaganda of Celle* and his cohorts .... (emphasis added).

#### 3. Third Article

In addition to the second article, the April 25 edition of the *Filipino Reporter* contained a smaller article, entitled "AT & T reviews contract." This third article appeared directly below the second. It began with the first statement at issue:

● In another development, *AT & T is reportedly withdrawing its sponsorship of Radyo Pinoy when its contract expires in July.* AT & T has been receiving information from some listeners who claimed that they are offended by the foul language used by Celle in his program. (emphasis added).

The second statement immediately followed:

● In addition, it is alleged that *AT & T is being shortchanged of its allotted time slot.* (emphasis added).

The third statement followed one sentence later:

● Critics of Radyo Pinoy claim *they could not get the frequency even in nearby areas such as Jersey City.* (emphasis added).

#### D. District Court Proceedings

The complaint of Celle and RMN–USA alleged that defendants had published the statements because *Filipino Reporter* is a competitor of *Headline Philippines* and because Pelayo was angry at Celle as a result of unflattering articles Celle had written about Pelayo's daughter.

On the first day of trial, the court issued three rulings from the bench. First, it held that Celle and RMN–USA are public figures. Second, it concluded that if the

various statements were proven false, they constituted libel per se because they disparaged the plaintiffs' professional reputation, and that, therefore, the plaintiffs were not required to prove special damages. Finally, the court concluded that each statement was one of fact rather than opinion, and, therefore, that all the statements were actionable.

After the plaintiffs rested, the defendants moved for a directed verdict. *See* Fed.R.Civ.P. 50(a). The court reserved decision.

Without objection, the court relied upon the authoritative New York Pattern Jury Instructions in drafting the jury charge and the verdict sheet. *See, e.g.*, 2 Committee on Pattern Jury Instructions, *New York Pattern Jury Instructions–Civil*, PJI 3:23, cmt.2 (cumm.supp.1999) (hereinafter "New York Pattern Jury Instructions"). These draft instructions—with extensive citations to cases, statutes and secondary authorities—are kept up-to-date by a distinguished group of New York Supreme Court Justices and law professors. They are relied upon in New York courts and in federal courts in diversity actions.

The jury was instructed that it should find an article libelous only if the plaintiffs had succeeded in proving (i) that it was defamatory, (ii) that it referred to the plaintiffs, (iii) that it had been read by a third party, (iv) that the statements were false, and (v) that the defendants had published the article with knowledge that it was false or with reckless disregard of its truth or falsity.

Should the jury determine that the plaintiffs had met the burden of proof on all five elements as to any article, it was directed to then consider damages. As to compensatory damages, the court stated that the plaintiffs were entitled to compensation for "[any] injury to [their] reputation and [any] humiliation and mental anguish in their public and private lives" that was caused by the articles found to be libelous. The jury was told that, to the extent that it found that the plaintiffs suf-

fered no injury, it should award nominal damages of $1. Finally, the jury was informed that it could award punitive damages if it found that in publishing the articles the defendants had acted maliciously, that is to say that they had made the statements "with deliberate intent to injure," "out of hatred, ill-will or spite" or "with willful, wanton or reckless disregard of another's rights."

The jury was provided with a verdict sheet structured as follows:

**Answer Questions 1, 2, *and* 3:**

1. Do you find that plaintiffs were libeled by the first article?

Yes _____ No _____

2. Do you find that plaintiffs were libeled by the second article?

Yes _____ No _____

3. Do you find that plaintiffs were libeled by the third article?

Yes _____ No _____

**If you answered "No" to *all* three of Questions 1, 2, and 3, you are done with this special verdict form and your deliberations are complete. If you answered "Yes" to *any* of Questions 1, 2, or 3, you must proceed to Questions 4 and 5.**

4. What amount of compensatory damages do you award plaintiffs?

$ _____

5. Do you find that defendants acted maliciously toward plaintiffs?

Yes _____ No _____

**If you answered "No" to Question 5, you are done with this special verdict form and your deliberations are complete. If you answered "Yes" to Question 5, you must proceed to Question 6.**

6. What amount of punitive damages, if any, do you award plaintiffs?

$ \_\_\_

(bold in original).

It is noteworthy that an answer of "yes" to "any" of questions 1, 2, or 3 would require the jury to consider damages. Thus, if any one or more of the articles was defamatory, the jury was authorized to find compensatory (including nominal) and punitive damages. Appellants approved this verdict sheet; they did not seek to have either compensatory damages or punitive damages allocated to particular articles. *Cf. Levine v. CMP Publications, Inc.,* 738 F.2d 660, 674–76 (5th Cir.1984) (damages allocated among the various libelous articles).

The jury returned a verdict finding that all three of the articles libeled the plaintiffs; that the plaintiffs were entitled to $1 in compensatory damages; that the defendants had "acted maliciously"; and that the plaintiffs were entitled to $15,000 in punitive damages.

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, the defendants renewed their motion for entry of judgment in their favor and, in the alternative, sought a new trial. The district court denied the motion and entered judgment for $15,001 in accordance with the verdict.

## III. LAW

### A. Choice

Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state, here New York, to decide which state's substantive law governs. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Erie R.R. v. Tompkins,* 304 U.S. 64, 74–77, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

As a first approach to the choice of law problem in libel actions New York assumes that the state of the plaintiff's domicile will usually have the most significant interest in the case and that its law should therefore govern. *See, e.g., Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999) (applying New Jersey libel law; "Under New York choice-of-law rules in defamation cases the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern." (internal quotation marks and citations omitted)). Were this standard applied, New Jersey's libel law might govern since both plaintiffs Celle and RMN–USA are New Jersey residents and a large portion of defendants' readership is in that state, suggesting that New Jersey might be the center of gravity for the dispute.

The district court applied New York libel law, explicitly relying on the New York Pattern Jury Instructions in drafting the charge without objection from any party. Since no party has challenged the choice of New York libel law, all are deemed to have consented to its application. *See Templeman v. Chris Craft Corp.,* 770 F.2d 245, 248 (1st Cir.1985); *see also Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999); *Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir. 1991). No reason of policy warrants a departure from their implied choice-of-law. *Compare Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 563 A.2d 31, 43–47 (1989), *with* N.Y. Pattern Jury Instructions, *supra,* PJI 3:34, at 275–76; *cf. Cooney v. Osgood Mach. Inc.,* 81 N.Y.2d 66, 78–79, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) (public policy exception in contracts choice of law).

In practice, litigants often ignore conflicts rules, opting instead to apply the law of the forum for reasons of familiarity, expediency or ignorance. To now remand for a finding of the center of gravity's location, *see generally* Harold L. Korn, *The Choice–of–Law Revolution: A Critique,* 83 Colum. L.Rev. 772, 821 (1983), would permit a losing party to lead a trial court into error and then to profit on appeal from the misguidance. Such ambushes are inconsistent with the "just, speedy, and inexpensive determination" of

cases required by the Federal Rules of Civil Procedure. Fed.R.Civ.P. 1.

### B. Libel

■■ Libel is a method of defamation expressed in writing or print. *See J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability & Litigation* § 36.04, at 226 (rev. ed.1997); Robert D. Sack, 1 *Sack on Defamation: Libel, Slander and Related Problems* § 2.3, at 2–7 (3d ed.1999) [hereinafter *Sack on Defamation*]. Under New York law, a plaintiff must establish five elements to recover in libel:

1) a written defamatory statement of fact concerning the plaintiff;

2) publication to a third party;

3) fault (either negligence or actual malice depending on the status of the libeled party);

4) falsity of the defamatory statement; and

5) special damages or per se actionability (defamatory on its face).

*See, e.g., Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp. 661, 666 (S.D.N.Y.1991); *Angio–Medical Corp. v. Eli Lilly & Co.,* 720 F.Supp. 269, 272 (S.D.N.Y.1989); 43A *NY Jur.2d: Defamation and Privacy* § 1, at 198 (1994); *Restatement (Second) of Torts* § 558, at 155 (1977);; *NY Pattern Jury Instructions, supra,* PJI 3:34, at 275–276.

[7] Though a state-based cause-of-action, the elements of a libel action are heavily influenced by the minimum standards required by the First Amendment. *See, e.g., Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (public figure must "surmount a much higher barrier"); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Pub'g Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see also Schiavone Constr. Co. v. Time, Inc.,* 847 F.2d 1069, 1082 (3d Cir.1988) (intricate relationship between First Amendment and state libel law). In particular, the showing of fault necessary to recover for libel varies depending on a plaintiff's position in society, requiring a higher degree of fault for public officials and public figures.

### 1. Public Figures

■■ If the plaintiff is a public official or public figure suing a media defendant, the First Amendment requires actual malice. *See Curtis Pub'g Co. v. Butts,* 388 U.S. at 155, 87 S.Ct. 1975 (public figures); *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710 (public officials); *see also Gertz,* 418 U.S. at 347, 94 S.Ct. 2997 ("States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."); *see generally* Jerome A. Barron & C. Thomas Dienes, *Handbook of Free Speech and Free Press* §§ 6:11–6:14, at 276–99 (1979); Erik Walker, Comment, *Defamation Law: Public Figures—Who Are They?,* 45 Baylor L.Rev. 955 (1993).

■■ Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures. *See Gertz,* 418 U.S. at 324, 94 S.Ct. 2997 (public figure is one who has achieved "general fame or notoriety in the community, and pervasive involvement in the affairs of society"); *see, e.g., Time, Inc. v. Firestone,* 424 U.S. 448, 453, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (wealthy divorcee who did not "assume any role of especial prominence in the affairs of society ... [and] did not thrust herself to the forefront of any particular public controversy" was not a public figure). Whether a plaintiff is a public figure is a question of law for the court. *See, e.g., Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1081 n. 4 (3rd Cir.1985) ("The classification of a plaintiff as a public or private figure is a question of law to be determined initially

by the trial court and then carefully scrutinized by the appellate court.").

Given plaintiff Celle's own characterization of himself as a "well known radio commentator" within the Metropolitan Filipino–American community, the district court correctly held that he is a public figure. *See, e.g., Maule v. NYM Corp.*, 54 N.Y.2d 880, 444 N.Y.S.2d 909, 429 N.E.2d 416, 417–18 (1981) (holding national sports writer to be a public figure). Plaintiff RMN–USA's status as owner and operator of a primary media outlet of the Metropolitan Filipino–American community—allowing it access to the "channels of communication" to rebut defamatory accusations—supports characterizing it as a public figure. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 589 (1st Cir.1980) ("To the extent that access to the channels of communication is a meaningful factor, we suspect that many, if not most, corporations have no particular advantage over private individuals."); *cf. Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273 (7th Cir.1983) ("[I]f the purpose of the public figure-private person dichotomy is to protect the privacy of individuals who do not seek publicity or engage in activities that place them in the public eye, there seems no reason to classify a large corporation as a private person.").

As public figures, plaintiffs had to establish actual malice to recover.

## 2. Defamation

The gravaman of an action alleging defamation is an injury to reputation. The New York Court of Appeals has defined a defamatory statement as one that exposes an individual "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." *Kimmerle v. New York Evening Journal*, 262 N.Y. 99, 186 N.E. 217, 218 (1933); *see Golub v. Enquirer/Star Group, Inc.*, 89 N.Y.2d 1074, 659 N.Y.S.2d 836, 681 N.E.2d 1282, 1283 (1997).

### a. Principles of Interpretation

"Whether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Aronson v. Wiersma*, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (1985). The New York Court of Appeals has developed standards that federal courts follow in determining whether a statement or publication is defamatory. *See, e.g., Davis v. Ross*, 754 F.2d 80, 83 (2d Cir.1985).

First, the Court of Appeals has repeatedly instructed that courts "must give the disputed language a fair reading in the context of the *publication as a whole.*" *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825, 829 (1995) (emphasis added). Challenged statements are not to be read in isolation, but must be perused as the average reader would against the "whole apparent scope and intent" of the writing. *November v. Time Inc.*, 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128 (1963); *see, e.g., Aronson*, 493 N.Y.S.2d 1006, 483 N.E.2d at 1139 ("[t]he words must be construed in the context of the entire statement or publication as a whole, [and] *tested against the understanding of the average reader*" (emphasis added)).

Second, courts are not to " 'strain' to interpret such writings 'in their mildest and most inoffensive sense to hold them nonlibelous.' " *November*, 244 N.Y.S.2d 309, 194 N.E.2d at 128. A fair reading controls.

Finally, "the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed.*" *Id.* (emphasis added). It is the meaning reasonably attributable to the intended reader

that controls. This determination can be particularly difficult where the readership in question constitutes a distinct ethnic community of which the judge is unfamiliar. In such instances, expert evidence or surveys can be useful, though none was supplied by the parties here.

### b. Defamatory Meaning

 A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning the court "must determine, as a matter of law, whether that one meaning is defamatory." *Davis*, 754 F.2d at 82; *see Aronson*, 493 N.Y.S.2d 1006, 483 N.E.2d at 1139. If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, "it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Davis*, 754 F.2d at 83.

### c. Opinion

 The court must also decide as a matter of law whether the challenged statement is opinion. *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306 (1977) ("Whether a particular statement constitutes fact or opinion is a question of law."). Unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions. *See Flamm v. American Assoc. of Univ. Women*, 201 F.3d 144, 147–48 (2d Cir.2000); *compare Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (rejecting the argument that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment."), *with Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, 1280 (1991) (Kaye, C.J.) (expressions of "pure" opinion receive absolute constitutional protection

under the New York Constitution), *and Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 435, 630 N.Y.S.2d 18 (1st Dep't 1995) ("imaginative expression" and "rhetorical hyperbole" are "pure" opinion subject to New York constitutional protection); *cf.* Robert D. Sack, *Protection of Opinion Under the First Amendment: Reflections on Alfred Hill, "Defamation and Privacy Under the First Amendment"*, 100 Colum. L.Rev. 294, 297–300, 322–25 (2000) (difficulty in defining non-actionable "opinions").

 The "essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were ... written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." *Steinhilber· v. Alphonse*, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550, 552–53 (1986). If the statement reasonably would be understood as implying undisclosed facts then it is not protected opinion under New York's constitution. *Id.; see also Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir.1985) ("[T]he inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the *perspective of an 'ordinary reader'* of the statement." (emphasis added)).

 The New York Court of Appeals has suggested a four factor test for differentiating statements of protected opinion from those asserting or implying actionable facts. *See Immuno AG.*, 566 N.Y.S.2d 906, 567 N.E.2d at 1280. These are:

1) "an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous";

2) "a determination of whether the statement is capable of being objectively characterized as true or false";

3) "an examination of the full context of the communication in which the statement appears"; and

4) "a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Steinhilber*, 508 N.Y.S.2d 901, 501 N.E.2d at 554 (internal quotation marks and citations omitted) (quoting *Ollman v. Evans*, 750 F.2d 970, 976 (D.C.Cir.1984) (en banc) (plurality opinion)). Notably, the *Steinhilber* court was careful to "eschew any attempt . . . to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied." *Id.* The burden rests with the plaintiff to establish that in the context of the entire communication a disputed statement is not protected opinion.

### d. Defamatory Per Se

■ New York recognizes certain statements as defamatory per se, meaning they are actionable without "pleading and proof of special damages." *Davis*, 754 F.2d at 82. "Special damages consist of 'the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation[.]'" *Matherson v. Marchello*, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (2d Dep't 1984); *see Sack on Defamation, supra*, § 2.8.7.1, at 2–113 ("Special damages refers only to pecuniary damages such as out-of-pocket loss." (internal citations omitted)); *cf. Blumenstein v. Chase*, 100 A.D.2d 243, 246, 473 N.Y.S.2d 996 (2d Dep't 1984) (distinguishing special damages from actual damages); *Sack on Defamation, supra*, § 2.8.7.1., at 2–113 (distinguishing special damages under state libel law from actual damages as used by the Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); actual damages is

broader than special damages, and includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.").

■ If a statement is defamatory per se, injury is assumed. In such a case, "[e]ven where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages." *Van–Go Transport Co., Inc. v. New York City Bd. of Educ.*, 971 F.Supp. 90, 100 (E.D.N.Y. 1997); *see, e.g., Buckley v. Littell*, 539 F.2d 882, 897 (2d Cir.1976) (nominal damages of $1); *Suckenik v. Levitt*, 177 A.D.2d 416, 416, 576 N.Y.S.2d 258 (1st Dep't 1991) (nominal damages of 1¢); *cf. Orlowski v. Koroleski*, 234 A.D.2d 436, 437, 651 N.Y.S.2d 137 (2d Dep't 1996) (awarding nominal damages in slander per se case where plaintiff failed to prove injury).

The line between statements that are defamatory per se and those that require proof of special damages remains fuzzy. *See Mullenmeister v. Snap–On Tools Corp.*, 587 F.Supp. 868, 871 (S.D.N.Y.1984) ("Considerable confusion persists as to what constitutes [defamation] per se."); *Matherson*, 100 A.D.2d at 236 n. 3, 473 N.Y.S.2d 998 (noting confusion in cases and among commentators); *Sack on Defamation, supra*, § 2.8.6.4, at 2–106 ("remains in disarray").

■ One useful general rule is that "'a writing which *tends* to disparage a person in the way of his office, profession or trade'" is defamatory per se and does not require proof of special damages. *Davis*, 754 F.2d at 82 (emphasis in original) (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 132 N.E.2d 860, 862 (1956) (Fuld, J.)); *see, e.g, November v. Time Inc.*, 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128 (1963) ("Plaintiff is a professional man. If, on their face, they (the words) are susceptible in their ordinary meaning of such a construction as would tend to injure him in that capacity, they are libelous per se and

the complaint, even in the absence of allegation of special damage, states a cause of action." (internal quotation marks and citations omitted)); *Bowes v. Magna Concepts, Inc.*, 166 A.D.2d 347, 349, 561 N.Y.S.2d 16 (1st Dep't 1990) (same); *Yesner v. Spinner*, 765 F.Supp. 48, 52 (E.D.N.Y.1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se,' and therefore actionable without any proof of special damages."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 791 (5th ed. 1984) ("[I]t is actionable without proof of damage to say of a physician that he is a butcher ..., of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes ...—since these things discredit [one] in his chosen calling."); *cf. Golub v. Enquirer/Star Group*, 89 N.Y.2d 1074, 659 N.Y.S.2d 836, 681 N.E.2d 1282, 1283 (1997); *Liberman v. Gelstein*, 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344, 347–48 (1992). *But see Kirby v. Wildenstein*, 784 F.Supp. 1112, 1115 (S.D.N.Y. 1992) (product disparagement actions differ from libel actions in that they deal with "words or conduct which tend to disparage or reflect negatively on the quality, condition or value of a product or property").

A related rule is that "[w]here a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed." *Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518, 522 (1981); *see Langenbacher Co. v. Tolksdorf*, 199 A.D.2d 64, 65, 605 N.Y.S.2d 34 (1st Dep't 1993) (statements that impugn "the basic integrity, creditworthiness and competence

of the business" are defamatory per se); *see also Davis*, 754 F.2d at 82 ("words are libelous if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof" (quoting *Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297 (1st Dep't 1977))).

### e. Single Instance Rule

The New York single instance rule is a narrow exception to the principle that a statement tending to disparage a person in his or her office, profession or trade is defamatory per se. It "applies where a publication charges a professional person with a *single error in judgment*, which the law presumes not to injure reputation." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825, 828 n. 5 (1995) (emphasis added) (internal citations omitted). Under this rule—which is applied in only a minority of states—a statement charging an individual with a *"single dereliction* in connection with his or her trade, occupation, or profession does not necessarily charge that party with general incompetence, ignorance or lack of skill and is not deemed actionable unless special damages are pleaded and shown." *Bowes v. Magna Concepts, Inc.*, 166 A.D.2d 347, 348, 561 N.Y.S.2d 16 (1st Dep't 1990) (emphasis added). In applying it, New York "recognizes the human tendency to err, and that, therefore, to state that even a businessman or professional person has erred in a particular instance would not presumptively cause damage to that person in his business or profession, because such statement would imply no more than that the person was human." Robert D. Sack, *Common Law Libel and the Press: A Primer*, 372 PLI/Pat 35, 64–65 (1993) (quoting Annot., *Libel and Slander: Actionability of Defamatory Statements as to Business Conduct, Relating to a Single Transaction or Occurrence*, 51 A.L.R.3d 1300, 1973 WL 33857 (1973)).

■ The single instance exception does not apply where a statement or publication that refers to a single instance imputes a general unfitness or unskillfulness, suggesting more than mere human error. *See, e.g., Armstrong,* 625 N.Y.S.2d 477, 649 N.E.2d at 828 n. 5 (statement that attorney suborned perjury goes beyond alleging mere human error and implies unethical character); *Cabin v. Community Newspapers, Inc.,* 27 A.D.2d 543, 544, 275 N.Y.S.2d 396 (2d Dep't 1966) (statement alleging grade tampering by member of the Board of Education for the benefit of his son did not fall under the single instance rule because it suggested a lack of integrity); *Rutman v. Giedel,* 67 A.D.2d 662, 662, 411 N.Y.S.2d 960 (2d Dep't 1979) (statement that police officer was drunk while on duty goes beyond alleging human error and suggests a "lack of character").

■ As its appellation implies, the single instance exception does not apply where a publication or article charges a plaintiff with multiple wrongful acts or lapses in judgment. *See, e.g., Ocean State Seafood, Inc. v. Capital Newspaper,* 112 A.D.2d 662, 666, 492 N.Y.S.2d 175 (3d Dep't 1985). Compound charges of error in a publication, when considered from the viewpoint of the average reader, can have the effect of accusing the "plaintiff of general incompetence or dishonesty in his profession." *Udell v. New York News, Inc.,* 124 A.D.2d 656, 658, 507 N.Y.S.2d 904 (2d Dep't 1986); *see also Immuno AG.,* 566 N.Y.S.2d 906, 567 N.E.2d at 1278 ("It has long been our standard in defamation actions to read published articles in context to test their effect on the average reader, *not to isolate particular phrases but to consider the publication as a whole.*" (emphasis added)). As a result, defendants who make compound charges of error are not entitled to the assumption that their charges did not injure reputation.

### 3. Falsity

■ A public figure seeking recovery in a libel action against a media defendant must establish the falsity of the defamatory statements. *See, e.g., Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (public figure must "show the falsity of the statements at issue to prevail in a suit for defamation"); *cf. Garrison v. State of Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (public officials must establish "that the utterance was false"). Placing this burden on plaintiffs has the effect of protecting some speech that is false. *See Philadelphia Newspapers,* 475 U.S. at 777, 106 S.Ct. 1558. Nonetheless, this allocation is necessary to avoid a chilling effect on truthful speech of public interest. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("The First Amendment requires that we protect some falsehood in order to protect speech that matters."); *see also New York Times Co. v. Sullivan,* 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (" 'Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press.' " (citing 4 *Elliot's Debates on the Federal Constitution* 571 (1876) (quoting James Madison))).

At present it is unclear whether a public figure must establish falsity by a preponderance of the evidence or by clear and convincing proof. *Cf. Goldwater v. Ginzburg,* 414 F.2d 324, 341 (2d Cir.1969) (*New York Times* established clear and convincing evidence as the burden of proof necessary only for actual malice, without expressly altering the burden of proof of other elements of libel, including falsity). The Supreme Court has expressly declined to address this issue. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence.... We express no view on this issue." (internal citations omitted)); *cf.*

*Philadelphia Newspapers,* 475 U.S. at 779 n. 4, 106 S.Ct. 1558 ("We also have no occasion to consider the quantity of proof of falsity that a *private-figure plaintiff* must present to recover damages." (emphasis added)).

The district court, without objection from the parties and in reliance on the New York Pattern Jury Instructions, cautioned the jury that falsity must be established by clear and convincing evidence. *See New York Pattern Jury Instructions, supra,* PJI 3:34, at 276 ("Fourth, plaintiff must prove by *clear and convincing evidence* that the statement was false, meaning substantially untrue."); *see generally* Marc A. Franklin & Daniel J. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity,* 25 Wm. & Mary L.Rev. 825, 864 (1983) ("Because the demarcation between the truth and falsity of the statement is of constitutional dimension, imposition of a preponderance of the evidence standard on the plaintiff is inadequate. If the plaintiff must persuade the court with convincing clarity that the defendant was at fault, the court certainly should not use a less rigorous standard to determine whether the statement was false."). Whether in fact clear and convincing proof is required to establish falsity under the Federal Constitution must remain an open question because, as the analysis below indicates, the facts of this case do not provide an occasion to resolve it. *See* Parts IV.B.2, C.2, and D.2, *infra.* In any event, the trial court's application of the clear and convincing standard favored defendant-appellants, and it was in accordance with the New York Pattern Jury Instructions, *see* New York Pattern Jury Instructions, *supra,* PJI 3:23; deference to state substantive law is appropriate under *Erie.*

■ Finally, in determining whether plaintiffs have established falsity, trial and appellate judges have a constitutional duty to carefully scrutinize the record as an added protection of the press. *See New York Times,* 376 U.S. at 285, 84 S.Ct. 710

("We must 'make an independent examination of the whole record so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.'" (internal citation omitted)); *Lerman v. Flynt Distrib. Co.,* 745 F.2d 123, 140 (2d Cir.1984) (same). The court should be left with no apprehension on the issue of falsity.

### 4. Actual Malice

■ As already noted, a public figure cannot recover damages for defamatory falsehoods unless he or she proves that the statement was made with actual malice at the time of publication. *See, e.g., Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion); *Schiavone Constr. Co. v. Time, Inc.,* 847 F.2d 1069, 1076 (2d Cir. 1987); *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 230 (2d Cir.1985). This demanding burden is based on two considerations. First, public figures (and public officials) generally enjoy access to the channels of communication and hence have an effective alternative outside of litigation to counteract false statements. *See Gertz,* 418 U.S. at 344, 94 S.Ct. 2997 ("The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation."). Second, they have knowingly and voluntarily exposed themselves to increased media scrutiny and an accompanying risk of injury from defamatory falsehoods by assuming a greater role in the public arena. *See id.* at 344–45, 94 S.Ct. 2997. *But see generally* Edward T. Fenno, *Public Figure Libel: The Premium on Ignorance and the Race to the Bottom,* 4 S.Cal. Interdisc. J. 253 (1995).

■ Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of the its truth or falsity. *See New York Times,* 376 U.S. at 280, 84 S.Ct. 710 (actual malice means "with

knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not"); *Lerman,* 745 F.2d at 141 (same); *Hotchner v. Castillo–Puche,* 551 F.2d 910, 912 (2d Cir. 1977) ("knowledge of falsity or with reckless disregard for the truth"; "[R]eckless disregard of the truth (means) subjective awareness of probable falsity . . . ." (internal quotations and citations omitted)).

Although actual malice is subjective, a "court typically will infer actual malice from objective facts." *Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 196 (1st Cir.1982) ("whether [defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *see Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 927 (2d Cir.1987) ("Malice may be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted."). These facts should provide evidence of "negligence, motive and intent such that *an accumulation of the evidence and appropriate inferences* supports the existence of actual malice." *Bose Corp.,* 692 F.2d at 196 (emphasis added); *see Goldwater,* 414 F.2d at 342 ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.")

■ Actual malice can be established "[t]hrough the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence[.]" *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293 (D.C.Cir. 1988); *see Clyburn v. News World Communications, Inc.,* 903 F.2d 29, 33 (D.C.Cir.1990) (proof of actual malice "may

take the form of circumstantial evidence, such as the existence of 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports' "). *But see St. Amant v. Thompson,* 390 U.S. 727, 732–33, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("Failure to investigate does not *in itself* establish bad faith." (emphasis added)).

■ Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice. *See Tavoulareas v. Piro,* 817 F.2d 762, 795 (D.C.Cir.1987) (en banc). *But see Dunn v. Air Line Pilots Ass'n,* 193 F.3d 1185, 1198 n. 17 (11th Cir.1999) ("Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with 'actual malice.' "). Standing alone, however, evidence of ill will is not sufficient to establish actual malice. *See Harte–Hanks Communications,* 491 U.S. at 666, 109 S.Ct. 2678 ("the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term"); *Shoen v. Shoen,* 48 F.3d 412, 417 (9th Cir.1995) (evidence of ill will "cannot, without more, establish actual malice"); *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612, 622–23 (2d Cir.1988) ("bare assertions of ill will are not sufficient to establish a triable issue of actual malice"); *see also Tavoulareas,* 817 F.2d at 795 ("The rationale for this rule is that speech 'honestly believed,' whatever the speaker's motivation, 'contribute[s] to the free interchange of ideas and the ascertainment of truth.' "); *see also id.* at 795 & n. 45 ("The appropriateness of such evidence *must be determined on a case-by-case basis* [.]" (emphasis added)).

■ Whatever evidence is relied upon, actual malice must be supported by clear and convincing proof. *See, e.g., Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("clear and convincing

evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement"); *New York Times,* 376 U.S. at 285–86, 84 S.Ct. 710 (must be established by "the convincing clarity which the constitutional standard demands"); *see also Gertz,* 418 U.S. at 342, 94 S.Ct. 2997 ("This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander.").

 In reviewing a finding of actual malice, judges are constitutionally obligated to conduct an independent examination of the whole record. *See Dalbec,* 828 F.2d at 927. This task is complicated in situations, such as the instant case, where the evidence turns in substantial measure on questions of credibility that are not easily resolved from a cold transcript. *See Newton v. National Broad. Co.,* 930 F.2d 662, 671 (9th Cir.1990) ("even when we accord credibility determinations the special deference to which they are entitled, we must nevertheless examine for ourselves the factual record in full" (internal quotation marks and citations omitted)); *cf. Harte–Hanks,* 491 U.S. at 700, 109 S.Ct. 2678 (Scalia, J., concurring) ("I would . . . mak[e] our independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made."). *But see generally* Marc E. Sorini, Note, *Factual Malice: Rediscovering the Seventh Amendment in Public Person Libel Cases,* 82 Geo.L.J. 563, 593–95 (1993) (independent court review of jury findings of actual malice clashes with Seventh Amendment). Nonetheless, the appellate court must find "clear and convincing evidence that the 'defendant in fact entertained serious doubts as to the truth of his publication,' or, in the alternative, knew of its falsity." *Dalbec,* 828 F.2d at 927 (quoting *St. Amant,* 390 U.S. at 731–32, 88 S.Ct. 1323); *see Bose Corp.,* 466 U.S. at 511, 104 S.Ct. 1949

("Judges, as expositors of the Constitution, must independently decide whether the evidence is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' ").

### 5. Punitive Damages

 Punitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel. *See Prozeralik v. Capital Cities Communications,* 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34, 41–42 (1993). To do so, plaintiffs must prove by a preponderance of the evidence that the libelous statements were made out of "hatred, ill will, [or] spite." *Id.* 626 N.E.2d at 42.

> Actual malice, as defined in *New York Times Co. v. Sullivan,* is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information. This does not measure up to the level of outrage or malice underlying the public policy which would allow an award of punitive damages, i.e., "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard of another's rights."

*Id.* (citations omitted).

 Common law malice is established by examining all of the relevant circumstances surrounding the dispute, including any rivalries and earlier disputes between the parties so long as they are not too remote. *See, e.g., Herbert v. Lando,* 441 U.S. 153, 164 n. 12, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("any competent evidence, either direct or circumstantial, can be resorted to [to establish common law malice], and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the ex-

istence of rivalry, [and] ill will, or hostility between the parties").

## IV APPLICATION OF LAW TO FACTS

### A. Form of Jury Charge

Plaintiffs sought to have the jury instructions divided into separate counts to reflect each of the seven allegedly defamatory statements appearing in the three newspaper articles. Defendants resisted this effort, insisting on the form used by the district court, posing three questions— one for each article. *See* Part II.D, *supra.* The defendants took this position even after the district court indicated that only one statement needed to be libelous for the jury to find against defendants with respect to a given newspaper article.

Because defendants accepted and argued in support of this structure for the jury verdict, a jury finding of libel as to a newspaper article will be sustained so long as at least one statement in the article is libelous.

### B. Single Instance Rule

■ As a matter of law the single instance exception is not applicable to the challenged statements. Defendants cannot gain the benefit of the single instance rule's assumption that plaintiffs have suffered no harm where, as here, multiple statements, each referring to a different mistake or error, are published in a closely related series of articles.

The challenged statements appeared in two consecutive issues of the *Filipino Reporter.* Given this temporal proximity, an average reader probably would not evaluate them in isolation, but would consider them together to conclude that plaintiff Celle had repeatedly indulged in unprofessional conduct. *See, e.g., November v. Time, Inc.*, 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128–29 (1963). Such a conclusion would affect his professional reputation within the Metropolitan Filipino–American community.

### C. First Article

#### 1. Defamation

■ Two statements in the first newspaper article are challenged as defamatory. The first is the sub-headline of the article which states that a "US judge finds Celle 'negligent.'" The second is a statement which misquotes the Ty opinion: "Moreover, [the judge] said, Ty claimed that she did not owe RMN (Radio Mindanao Network) money for advertisements and *'therefore Celle's statements implying that she failed to pay her debts to RMN were false.'*" (emphasis added). Although the emphasized portion of the second statement appears in the Ty opinion, it is not a ruling of the court but merely a quotation lifted from the complaint. Plaintiffs claim that, as it appears in the article, the statement creates the false impression to an average reader that the emphasized portion is actually attributable to the judge as a legal ruling rather than merely as an accusation made by Ty.

The district court correctly concluded that both statements were defamatory per se. The sub-headline stating that "US judge finds Celle negligent" has only one meaning, namely that plaintiff has been found to have libeled Ms. Ty. As a news commentator in a tightly-knit ethnic community, plaintiff Celle's professional reputation would turn in large measure on the community's faith in the accuracy and fairness of his reporting. The statement that a United States judge has found plaintiff negligent for spreading false information would leave readers with the conclusion that he abused his position as a news commentator. *Cf. November*, 244 N.Y.S.2d 309, 194 N.E.2d at 128 ("The casual reader might not stop to analyze, but could easily conclude that plaintiff is a crook and let it go at that." (internal quotation marks and citations omitted)).

The second statement is defamatory per se because it impugns plaintiff Celle's trustworthiness. As written it would lead

an average reader to believe that the judge in the Ty matter found Celle made "false" accusations about Ty's financial obligations. Considered in the context of the entire article—part of which states that Celle threatened to call Ty numerous derogatory terms on the air unless she met her financial obligations to him—it would cause listeners and advertisers of Radyo Pinoy who read the article to question Celle's professional integrity.

## 2. Falsity

A review of the Ty opinion establishes that both defamatory statements in the first article are false. The judge, ruling on a motion for summary judgment, did not find Celle negligent. Nor did he find that Celle had made false statements regarding Ty's debts to Radyo Pinoy.

## 3. Actual Malice

■ Plaintiff introduced sufficient circumstantial evidence to establish clearly and convincingly that defendant Pelayo entertained serious doubts about the truth of the headline "US judge finds Celle 'negligent.'" This conclusion is based in part on evidence indicating ill will and personal animosity between Celle and Pelayo at the time of publication.

As noted earlier, the ill will originated in part from several newspaper articles Celle authored detailing a criminal conviction of Pelayo's daughter. Pelayo believed that at least one of these articles made a "legal error in the term of the criminal conviction," erroneously alleging that his daughter had been convicted of theft instead of the lesser crime of possession of stolen property. A reasonable juror—considering the ill will, and the factual similarity between the basis for that ill will and the publication of the challenged statement here—could conclude that Pelayo was imposing in-kind retribution on Celle by exaggerating the status of the legal proceedings against him.

In addition, a fair assessment of Pelayo's own testimony casts doubt on whether at the time of publication he believed the sub-headline stating that Celle had been found negligent. For instance, Pelayo admitted that the lead headline and the body of the article are *on their face* at odds with the sub-headline which stated Celle was found negligent. He testified:

> Well, if you go through the entire context of the story, counsel, the headline itself says in bold letters that the libel case is going to a jury, and that alone [sic] presumption that there has been no finding as to guilt or not guilt of the plaintiff.

Though defendant Pelayo testified that he did not doubt the accuracy of the sub-headline, his subsequent testimony as to the alleged basis for this belief suggests otherwise. *See Schiavone Constr. v. Time, Inc.,* 847 F.2d 1069, 1090 (3d Cir.1988) ("[O]bjective circumstantial evidence can suffice to demonstrate actual malice. Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true."). The trial transcript reads:

> [Defendants' Counsel]: What is the basis for that belief in the truth [of the article], Mr. Pelayo?
>
> [Pelayo]: As I read the decision at that time ... [of writing the story], there was a portion there that said that the element of negligence *could be found* on the basis of the testimony and evidence related in the case. (emphasis added).

In further testimony Pelayo admitted that at the time he wrote the article he understood no decision had been reached on Celle's negligence:

> [Defendants' counsel]: And you added [to the column], "The case will go to the jury sometime next month or June, depending upon the court calendar, or they may decide to settle out of court." What was the purpose of that?
>
> [Pelayo]: That indicates, counsel, that *the case has not been decided one way or the other.*

[Defendants' counsel]: So that erases anyone's impression that suit [sic], having a U.S. Judge finding Celle negligent, is that why you did not print a retraction?

[Pelayo]: Yes, counsel.

A reasonable juror, hearing that exchange, could conclude that defendant Pelayo actually understood at the time of the writing that no determination of negligence had actually been rendered. *Cf. Restatement (Second) of Torts, supra*, § 580A cmt. d, at 219 ("Under certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] ... might be relevant in showing recklessness at the time the statement was published."). Having found that the sub-headline in the first article is based on sufficient evidence for a jury verdict of libel, there is no need to analyze the remaining statement.

### D. Second Article

#### 1. Defamation

■ For purposes of determining whether the statements in the second and third articles are susceptible of a defamatory construction, the two articles should be read together. As already discussed, the New York Court of Appeals requires that statements be construed in the context of the publication as a whole as an average reader would read and consider them. *See, e.g., November*, 244 N.Y.S.2d 309, 194 N.E.2d at 128 ("If every paragraph had to be read separately and off by itself plaintiff would fare pretty well. But such utterances are not so closely parsed by their readers ... and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent."). The third challenged article appeared directly under the second article in the same issue of the *Filipino Reporter*. That the defendants intended for the two articles to be read together is confirmed by the transitional opening of the third article: "*In another development*, AT & T is ...." (emphasis added). A casual reader no doubt would read and consider these articles together.

■ Two statements form the core of plaintiffs' libel claim with respect to the second article. The first statement reads: "Alarmed by dwindling listeners, advertisers and an ongoing lawsuit, a controversial New Jersey based radio announcer last week took a last-ditch desperate act by scaring outlets with lawsuits if they distributed copies of **The Filipino Reporter** containing a factual report of a court decision rejecting his motion to dismiss a $5 million defamation suit slapped against him." (bold in original). The second statement reads: "Store outlets throughout the metro New York and New Jersey area ignored the black propaganda of Celle and his cohorts...."

The statement that Celle was "[a]larmed by dwindling listeners, [and] advertisers," and was thus taking a "last-ditch desperate act," when read in the context of the third article's claim that AT & T is "withdrawing its sponsorship of Radyo Pinoy" casts significant doubt on the economic viability of Radyo Pinoy. *Cf. Restatement (Second) of Torts, supra*, § 573 cmt c., illus. 5. This is defamatory per se. Because the statement may be subject to other meanings, all of which may not be defamatory, the court defers to the jury's finding that the statement was defamatory as it would likely be understood by the "ordinary and average reader." *James v. Gannett Co.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834, 837–38 (1976).

With respect to the accusation that Celle was spreading "black propaganda," it is not possible on this record to determine if it carries a defamatory meaning. Plaintiffs failed to identify a plausible defamatory meaning of the phrase in the context in which it is used. For example, one of plaintiffs' witnesses testified that "black propaganda" is "racist" propaganda. Plaintiff Celle posited a different meaning, testifying that "black propaganda" means

"disseminating false information about someone." Neither of these definitions fits, given the context of the articles. The articles neither allude to racist statements made by Celle nor do they suggest that Celle spread "false information" to the local sellers of the *Filipino Reporter*. Furthermore, plaintiffs' own witness testified that "black propaganda" is not a "commonly use[d]" term in the Metropolitan Filipino–American community, thus suggesting that it does not carry a unique cultural meaning with a defamatory connotation.

Moreover, in the absence of plaintiffs advancing a reasonably precise and unambiguous meaning, it is not possible to determine whether the statement is protected opinion under New York's constitution. *See Steinhilber v. Alphonse*, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550, 554 (1986) (distinguishing fact from opinion requires consideration of "whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous").

### 2. Falsity

■ Scrutinizing the record with respect to the challenged statements in article two leads to the conclusion that the plaintiff did not establish falsity either by a preponderance of the evidence or by clear and convincing proof. With respect to the first challenged statement, evidence supporting falsity consisted of nothing more than the following exchange:

[Plaintiffs' attorney]: I would like to ask you, true or false, at the time this article was written, did your radio station have dwindling listeners and advertisers?

[Celle]: No.

[Plaintiffs' attorney]: True or False?

[Celle]: False.

While a bland cryptic claim of falsity supported by the credibility of a witness might be sufficient to establish a proposition in other civil cases, the First Amendment demands more. *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287,

1292 (D.C.Cir.1988) ("Where the question of truth or falsity is a close one, a court should err on the side of non-actionability."). To accept such a colorless denial as sufficient proof would effectively shift plaintiffs' burden of establishing falsity onto media defendants to establish truth. This shift would impermissibly chill expression since "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772–73, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

This conclusion is bolstered by a recognition that plaintiffs such as Celle can be expected to have easy access to additional proof of falsity. At a minimum, Celle should have laid a foundation for his bald assertion of falsity. For example, he could have discussed the advertising trends at Radyo Pinoy. He also could have introduced evidence detailing advertising volume or gross advertising sales for the period leading up to the second article without revealing proprietary information in a damaging way.

Likewise, the challenged statement regarding "black propaganda"—even assuming the court could glean a defamatory meaning which is not protected opinion—was insufficiently established as false. Again, the only evidence plaintiffs advanced to establish falsity was a cryptic denial consisting of the following exchange:

[Plaintiffs' attorney]: Is [the statement regarding black propaganda] true or false?

[Celle]: That is false, sir.

Celle's benign denials, in the absence of *at least* foundation testimony or extrinsic evidence, are not sufficient to satisfy the constitutional requirement that a public

figure establish falsity. *Cf. Philadelphia Newspapers,* 475 U.S. at 778, 106 S.Ct. 1558 ("We recognize that requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so.").

Having failed to identify a statement in the second article that is a defamatory falsehood, plaintiffs did not establish that the second article is libelous. Accordingly, this portion of the jury verdict cannot stand.

### E. Third Article

#### 1. Defamation

■■■ Three statements form the basis for plaintiffs' claims with respect to the third article. The first statement reads in pertinent part, "AT & T is reportedly withdrawing its sponsorship of Radyo Pinoy when its contract expires in July." The second statement declares, "AT & T is reportedly being shortchanged of its allotted time slot." The third statement is, "Critics of Radyo Pinoy claim they could not get the frequency even in nearby areas such as Jersey City."

The district court correctly concluded that the three challenged statements are defamatory per se. Read as a whole, the first two challenged statements imply that AT & T is "withdrawing its sponsorship of Radyo Pinoy" in part because it "is being shortchanged" by Celle. This clearly attacks his trustworthiness as a businessperson.

Celle's professional integrity is also challenged by the statement that Radyo Pinoy's radio frequency could not be picked up in Jersey City. He marketed the sideband radios to the Metropolitan Filipino–American community on the implied promise that purchasers could receive Radyo Pinoy's signal. Though the sale of sideband radios was not expressly addressed in the article, it was "presumably known" by the average reader in the Metropolitan Filipino–American community given that Radyo Pinoy only broadcast on a side-band

frequency. *See Hinsdale v. Orange County Publications, Inc.,* 17 N.Y.2d 284, 270 N.Y.S.2d 592, 217 N.E.2d 650, 653 (1966) ("[A] fact not expressed in the newspaper but presumably known to its readers is part of the libel."). In suggesting that purchasers could not receive the signal—presumably the very reason for the purchase—the article portrays Celle to be a cheat. *See, e.g., Van–Go Transport Co., Inc. v. New York Bd. of Educ.,* 971 F.Supp. 90, 98 (E.D.N.Y.1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or general unfitness, incapacity, or inability to perform one's duties.").

#### 2. Falsity

■ Plaintiffs sufficiently established the falsity of the defamatory statements in the third article.

With respect to the accusation that "AT & T is reportedly withdrawing its sponsorship of Radyo Pinoy" after having been "shortchanged of its allotted time slot," a reasonable juror evaluating the evidence could find—by both a preponderance of the evidence and by clear and convincing proof—that those statements were false. Celle swore that AT & T was not withdrawing its sponsorship of Radyo Pinoy and that AT & T was not being shortchanged on advertising time. He also testified that AT & T had never complained to Radyo Pinoy that it was being shortchanged. Finally, he testified that AT & T continued advertising with Radyo Pinoy, a matter which was not contested.

■ Plaintiffs established that Radyo Pinoy's signal could be picked up in Jersey City. Celle testified that the station had never received complaints from listeners claiming they could not receive the signal in Jersey City. A resident of Jersey City testified on behalf of the plaintiffs that he could receive Radyo Pinoy's signal in Jersey City.

### 3. Actual Malice

■ Clear and convincing evidence supports the jury finding that Pelayo entertained serious doubt as to the truth of the allegation that AT & T "was withdrawing its sponsorship of Radyo Pinoy" in part because it was being "shortchanged of its allotted time slot."

Defendants' sole source for the story was an official at AT & T who appears not to have been involved with the account at the time the article was written and who had in fact moved to California. The official's lack of current knowledge suggested a reasonable basis for defendants to question the accuracy and reliability of the information he provided. Nonetheless, Pelayo did not investigate the accuracy of the story. Considering the evidence of ill will Pelayo felt towards Celle, a reasonable juror could conclude that Pelayo knowingly and recklessly ignored the probable falsity of the story and printed it. *See St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."); *Perk v. Reader's Digest Ass'n, Inc.,* 931 F.2d 408, 411 (6th Cir.1991) (in analyzing whether failure to investigate provides circumstantial evidence of recklessness to satisfy the actual malice standard, "this Court must look at each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was"); *Babb v. Minder,* 806 F.2d 749, 755 (7th Cir.1986) ("[R]eckless conduct may be evidenced in part by failure to investigate thoroughly and verify the facts ... particularly where the material is peculiarly harmful or damaging to the plaintiff's reputation or good name." (internal quotation marks and citation omitted)).

The finding of actual malice is bolstered by Pelayo's conflicting testimony about the basis for the accusation that AT & T was being shortchanged. Pelayo initially suggested that he was informed by the official at AT & T that it was being shortchanged. He then stated that the official "did not say that" to him. *Cf. Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1071 (5th Cir.1987) ("When the only 'source' of a story did not contain the statements supposedly derived from it, the courts have inferred that defendant recklessly fabricated the story.'"). This divergence is particularly striking because Pelayo appears to have been intimately involved with the article. The testimony demonstrates that Pelayo either authored parts of the article, or that he was an indirect source for a substantial portion of the article and in fact reviewed it before it was printed. Nonetheless, he was unable to identify the original source of this specific statement or to indicate who had written it. In light of these circumstances, a reasonable juror could infer actual malice by clear and convincing evidence. *Cf. St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323 ("The defendant in a defamation action brought by a public official cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."); *Zerangue,* 814 F.2d at 1070 ("Although the defendant's state of mind [regarding actual malice] is a subjective fact, it can be shown by indirect or circumstantial evidence. *Sufficient indirect evidence of actual malice can defeat a defendant's unsupported statement that he did act in good faith.*" (citation omitted) (emphasis added)).

Having concluded that at least one statement in the third article was libelous, it is unnecessary to delve into the remaining statement. The jury properly found that the defendants libeled plaintiffs in the third article.

### F. Punitive Damages

■ Plaintiffs introduced sufficient proof of ill will and spite to sustain the award of punitive damages despite the reversal of the libel finding with respect to the second article. Evidence included testimony that Celle and Pelayo directed

competing media outlets. It also included Pelayo's testimony alleging that Celle had earlier published erroneous articles on his daughter's criminal conviction. This history of animosity provided strong evidence that Pelayo acted with ill will and spite to deliberately injure Celle's professional reputation within the Metropolitan Filipino–American community by publishing the libelous articles.

 In light of the reversal on the second article, however, the punitive damage award is excessive. It may punish speech that is constitutionally protected. Ordinarily the issue of punitive damages would be remanded to the trial court for consideration of the appropriate amount of reduction or for a new trial. Here the interests of justice, and the avoidance of unnecessary expensive and repetitive litigation, support the exercise of appellate remittitur authority to proportionally reduce the award to $10,000. *Cf. Buckley v. Littell,* 539 F.2d 882, 897 (2d Cir.1976) (reducing punitive damages and declining to remand punitive damages issue for retrial despite overturning one of multiple jury findings of libel).

If plaintiffs do not accept the remittitur, the district court shall vacate the punitive damage award and retry either the punitive damage issue, or the entire case. *See, e.g., Hetzel v. Prince William County,* 523 U.S. 208, 118 S.Ct. 1210, 1211–12, 140 L.Ed.2d 336 (1998) (per curiam) (Court of Appeals' order "requiring the District Court to enter judgment for a lesser amount than that determined by the jury without allowing [plaintiff] the option for a new trial, cannot be squared with the Seventh Amendment."); Fed.R.Civ.P. 50(d) ("If the appellate court reverses [the denial of a motion for judgment as a matter of law], nothing in this rule precludes it from determining that the appellee is entitled to a new trial, or from directing the trial court to determine whether a new trial shall be granted."); *Sack on Defamation, supra,* § 10.5.4, at 10–47 (trial or appellate court "may grant a remittitur, where the

plaintiff must either accept a lower verdict or pursue a new trial"); *see generally* Jack H. Friedenthal, Mary Kay Kane, and Arthur R. Miller, *Civil Procedure* § 12.4 (1998) (3d ed.1999); Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, 11 *Federal Practice and Procedure* § 2815 (2d ed.1995).

## V. CONCLUSION

A close review of the record in accordance with First Amendment strictures reveals evidence sufficient to require affirming the libel findings as to only the first and third articles. The portion of the verdict and judgment concluding that the second article is libelous is reversed.

With respect to the damage awards, the $1 award of nominal damages is affirmed. In light of the reversal of the libel finding of the second article, the punitive damages award is conditionally remitted by $5,000. If plaintiffs do not accept this remittitur, the district court shall vacate the punitive damage award and retry either the punitive damage issue or, in its discretion, the entire case.

AFFIRMED in part and REVERSED in part. REMANDED to the District Court with instructions.

JACOBS, Circuit Judge, dissenting:

I respectfully dissent. Although I accept many of the stated premises of the majority opinion, and some of the holdings, I must disagree with the ultimate analysis and the result.

Thus I agree with the majority that "the elements of a libel action are heavily influenced by the minimum standards required by the First Amendment," *ante* at 176; that the plaintiffs here are public figures who are required to demonstrate actual malice, *see ante* at 177; that the statements in the various articles are potentially defamatory, *see ante* at 185–86, 187–88; and that where (as in this case) the libel defendants resist a jury charge that re-

quires the jury to consider the alleged libels statement-by-statement within each publication (here within each article), and instead insist upon a jury finding of libel as to each publication, liability is properly sustained as to each publication if any one statement within it is actionable, *see ante* at 185. Finally, I agree that the evidence of falsity is insufficient to support the jury finding of liability as to the second of the three articles at issue. *See ante* at 188–89.

## A

Because constitutional interests mandate that protected speech not be suppressed by libel lawsuits, public figures may recover libel damages only upon a showing that allegedly libelous statements were "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Here, because we hold that the plaintiffs failed to prove that the challenged statements in the second article were false, there can be no doubt that those statements are protected speech. In light of that conclusion, I agree with the majority's remittitur of the punitive damages award (assuming of course that there is a compensatory damages award, or nominal one, that can properly furnish a predicate for punitive damages).

The most dangerous error of the majority opinion is to affirm the damage award—which was entered on an undifferentiated jury finding of actual malice as to *all three* articles—notwithstanding our unanimous rejection of the liability finding as to the second article. A plaintiff seeking damages resulting from both constitutionally protected *and* unprotected speech may recover only those damages arising out of speech that is unprotected. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915–30, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *cf. Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342–50, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (limiting discussion of when libel damages may be awarded to instances in which defamatory falsehoods have been proven). At this point, however, no one can say whether the damage award is solely attributable to one or both of the articles as to which the actual malice finding is sustained, or whether the damage award is solely attributable to the article now unanimously held to contain constitutionally protected speech. Since plaintiffs can recover a libel award only if the speech is unprotected, and since that showing cannot be made on this record, I would reverse the judgment on damages, and let the punitive damages award fall with it, or alternatively remand for a new trial.

The effect of the majority opinion is to affirm a libel award that (for all the record shows) may be attributable to constitutionally protected speech. Although it is true that the punitive damages award is the subject of remittitur and the remaining financial stake in this case is a one-dollar nominal damages award, that one dollar is (so far as I can tell) the first dollar in libel damages held on appeal to be payable by a journalist without regard to whether what was said is constitutionally protected. For that reason I fear that this is an important case and that the majority's error is a subversive one.

## B

The majority opinion duly recites the principle that judges have a constitutional obligation to conduct an independent examination of the record to ascertain whether there is adequate support for a jury's finding of actual malice. *See ante* at 183–84; *see also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("Appellate judges ... must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity."). The majority also recites the principle that any subsequent

finding of actual malice must be supported by proof that is clear and convincing. *See ante* at 183.

With respect, I must say that the majority opinion recites the duty of independent examination without performing it. The majority opinion holds only that the evidence is sufficient to convince a reasonable juror,[1] but fails to recognize that evidence sufficient to convince a reasonable juror is here not enough to "cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose,* 466 U.S. at 511, 104 S.Ct. 1949; *see also id.* at 501, 104 S.Ct. 1949 ("[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge.").

Under the independent review required by law and prudence, I conclude that the liability findings as to the first and third articles are unsupportable under applicable principles of law.

### C

All of the challenged statements in the first article are reportage on a legal opinion rendered by Judge Mukasey in one of the underlying litigations. The sub-headline, which the majority opinion deems actual malice, says, "US judge finds Celle 'negligent.'" The body of the first article repeats that observation, adding that the procedural act was the "dismiss[al]" of Celle's summary judgment motion. The remaining statement at issue in the first article is a quotation from Judge Mukasey's opinion that describes a claim being asserted by one of the parties.

The majority opinion evaluates these statements by setting forth an excerpt from the trial transcript and concluding that "*[a] reasonable juror,* hearing that exchange, could conclude that defendant Pelayo actually understood at the time of the writing that no determination of negligence had actually been rendered." *Ante* at 187 (emphasis added). I do not think that this excerpt can support a finding of actual malice. The record shows that the challenged passages from the first article are a non-lawyer's mistaken, careless interpretation of a judicial opinion governed by relatively complex procedural rules. Such a mistake does not establish actual malice. *See, e.g., Time, Inc. v. Pape,* 401 U.S. 279, 289–92, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (finding that deliberate omission of the word "allegation" or its equivalent in an article describing a government report, while erroneous, was insufficient to create a jury issue regarding actual malice); *Suozzi v. Parente,* 202 A.D.2d 94, 616 N.Y.S.2d 355, 359 (1st Dep't 1994) ( holding that "misinterpretation of a source or the resolution of an ambiguity adversely to the plaintiff or in accordance with a particular political view" does not constitute actual malice).

The challenged statements in the third article are that "AT & T is reportedly withdrawing its sponsorship of Radyo Pinoy when its contract expires in July"; that "AT & T is being shortchanged of its allotted time slot" by Radyo Pinoy; and that "[c]ritics of Radyo Pinoy claim" that they cannot receive its signal even in nearby areas. With respect to the last statement, the majority opinion declines to reach whether the statement was made with actual malice.[2] With respect to the other statements, the evidence at trial shows only that Pelayo relied on a dubious source and failed to investigate the story

---

1. For example, with respect to the third article, the majority opinion analyzes the evidence and concludes that "[i]n light of these circumstances, *a reasonable juror* could infer actual malice by clear and convincing evidence." *Ante* at 190 (emphasis added); *see also ante* at 186–87 (discussing first article).

2. It was undisputed at trial, however, that the station could not be heard without special equipment, about which the article was silent.

fully when he made these statements. Pelayo talked to only one official at AT & T, and that source was no longer involved with the Radyo Pinoy account. Pelayo also gave conflicting testimony about whether that official, or someone else, told him that AT & T was being shortchanged. These shortcomings also do not establish actual malice. "[T]he failure to investigate [a statement's] truth, standing alone, is not enough to prove actual malice even if a prudent person would have investigated before publishing the statement." *Sweeney v. Prisoners' Legal Servs., Inc.*, 84 N.Y.2d 786, 622 N.Y.S.2d 896, 899, 647 N.E.2d 101 (1995); *see also St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("Failure to investigate does not in itself establish bad faith."). More particularly, reliance on biased sources, or failure to investigate when bias is revealed, is insufficient to establish actual malice. *See Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 92–93 (S.D.N.Y.1980).

## D

For the reasons stated above, actual malice cannot be shown in the first article solely on the basis of a layman's confused reporting of a legal proceeding, and actual malice cannot be shown in the third article solely on the basis of an untalented reporter's reliance on dubious sources. All that is left to support the majority's holding of liability with respect to the first and third articles is that both articles were published in an atmosphere of spite and ill will between the parties.

It is hornbook law, however, that spite and ill will are simply not enough to establish actual malice as the motive for erroneous reporting. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 & n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term."); *Herbert v. Lando*, 781 F.2d 298, 307–09 & n. 6 (2d Cir.

1986) (finding previous hostile statements between parties, including "I'll get you" and "I'll destroy you," insufficient to establish actual malice). "In the context of a libel suit, 'actual malice' simply does not mean ill-will or spite.... 'Actual malice' is now a term of art having nothing to do with actual malice." *Reliance Ins. Co. v. Barron's*, 442 F.Supp. 1341, 1349–50 (S.D.N.Y.1977). We may not affirm unless we are confident that the evidence presented at trial established that Pelayo published the statements "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The majority opinion recognizes this principle, *see ante* at 183, but does not apply it. Thus, in respect of the first article, the majority concludes that "[a] reasonable juror—considering the ill will, and the factual similarity between the basis for that ill will and the publication of the challenged statement here—could conclude that Pelayo was imposing in-kind retribution on Celle by exaggerating the status of the legal proceedings against him." *Ante* at 186. In respect of the third article, the majority concludes that "[c]onsidering the evidence of ill will Pelayo felt towards Celle, a reasonable juror could conclude that Pelayo knowingly and recklessly ignored the probable falsity of the story and printed it." *Ante* at 190.

I think it is dangerous to rely on ill will between the parties to save an otherwise insufficient finding of actual malice. Here the ill will is personal, but ill will can also be based on politics (not to mention everything else). The holding of the majority opinion is that ill will combined with sloppy reporting, or with a non-lawyer's confusion over a judge's ruling, will support a finding of actual malice. In my view, that goes some distance toward undoing *New York Times v. Sullivan.*

E

I appreciate that the judgment at stake here is a single dollar, and that my approach might require a remand for another trial over that trifling sum. But judicial economy is not a substantive principle of law, and while I do not suggest that the result reached by the majority is driven by a reluctance to compel a new trial over a nominal award, I think it is fair for me to explain why I would impose that burden on a busy district court in this case.

In arriving at the result that may avoid a retrial, the majority opinion unsettles a series of legal principles. By way of summary, the majority opinion allows a damage award to stand even though it may punish constitutionally protected speech; it allows a finding of actual malice to be based on the kind of confused reporting of legal proceedings that is only too common when the lay press reports judicial acts, and on sloppy sourcing and reporting, which is epidemic; and it allows the deficiencies of those proofs to be made up by evidence of some ill will. Hostility, however, is no offense against standards of journalism, and ill will is the mother's milk of political reportage and opinion.

I would resolve this case by holding (upon an independent review of the evidence) that actual malice was not shown, and I would emphasize the observation set forth in the majority opinion that public figures—by definition—have the public opportunity to rebut the falsehoods uttered against them. *See ante* at 177. And, here, where the plaintiffs and defendants both have the ear of the same tightknit community, the rigorous standards of actual malice may be applied to defeat this claim without reputational damage on any matter plaintiffs wish to dispute in the public forum to which they have open access.